Luke D. Miller, OSB No. 175051
Military Disability Lawyer, LLC
1567 Edgewater St. NW
PMB 43
Salem, OR 97304
Telephone: (800) 392-5682
Fax: (503) 779-1091
luke@militarydisabilitylawyer.com

Jacob Huebert (*pro hac vice*)
Aditya Dynar (*pro hac vice*)
Goldwater Institute
Scharf-Norton Center for Constitutional Litigation
500 E. Coronado Rd.
Phoenix, AZ 85004
Telephone: (602) 462-5000
Fax: (602) 256-7045
litigation@goldwaterinstitute.org

        Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DANIEL Z. CROWE, et al., | Case No. 3:18-cv-02139-JR |
| Plaintiffs, | PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION |
| v. | |
| OREGON STATE BAR, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Table of Contents ............................................................................................. i

Table of Authorities ......................................................................................... ii

LEGAL STANDARD .......................................................................................1

OBJECTIONS ....................................................................................................2

I.  The Court should deny Defendants' motion to dismiss under Rule 12(b)(1)
because the Oregon State Bar is not entitled to Eleventh Amendment immunity. .....................2

    A.  A money judgment against the OSB would not be satisfied out of state funds. ..............3

    B.  The OSB does not perform central government functions.  .............................6

    C.  The OSB may sue and be sued.  ..................................................................9

    D.  The OSB may take property in its own name, not the name of the state. ........................9

    E.  The OSB's corporate status weighs against immunity.  ................................10

II.  The Court should deny Defendants' motion to dismiss under Rule 12(b)(6) because Plaintiffs
have stated claims for violations of their First and Fourteenth Amendment rights. ……...........12

    A.  Plaintiffs have stated a First and Fourteenth Amendment claim against
mandatory OSB membership. .....................................................................13

        1.  Supreme Court precedent does not foreclose Plaintiffs' claim. ..............................13

        2.  Dismissal is improper because Defendants have not shown that mandatory bar
membership satisfies exacting First Amendment scrutiny.  .....................................14

    B.  Plaintiffs have stated a First and Fourteenth Amendment claim challenging OSB's use
of mandatory fees for political and ideological speech and other non-germane activities
without members' affirmative consent.  ......................................................16

    C.  Plaintiffs have stated a First and Fourteenth Amendment claim challenging OSB's lack
of safeguards to ensure member fees are not used for non-germane activities.  ............18

III.  Plaintiffs object to the Recommendation's conclusions about the *Bar Bulletin* statements to
which they objected.  ........................................................................................21

CONCLUSION ................................................................................................25

CERTIFICATE OF SERVICE ........................................................................27

**TABLE OF AUTHORITIES**

## Cases

*Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) ........................................ 14, 17

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775 (9th Cir. 2005)
................................................................................................................ passim

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) ........................................................1

*Chi. Teachers Union v. Hudson*, 475 U.S. 292 (1986) ........................ 16, 19, 20, 21

*Coultas v. Payne*, No. 3:12-cv-1132-AC, 2012 WL 6725845 (D. Or. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6726247 (D. Or. Dec. 27, 2012) .........................................................................................................................3

*Crosetto v. State Bar of Wis.*, 12 F.3d 1396 (7th Cir. 1993) ...............................4, 5

*Durning v. Citibank, N.A.*, 950 F.2d 1419 (9th Cir. 1991) ........................... 2, 3, 12

*Eardley v. Garst*, No. 99-36057, 232 F.3d 894, 2000 WL 1029087 (9th Cir. 2000) 3

*Eason v. Clark Cnty. Sch. Dist.*, 303 F.3d 1137 (9th Cir. 2002) .............................12

*Erwin v. Or. ex rel. Kitzhaber*, 231 F.Supp.2d 1003 (D. Or. 2001), *aff'd*, 43 Fed. Appx. 122 (9th Cir. 2002).....................................................................................3

*Gardner v. State Bar of Nev.*, 284 F.3d 1040 (9th Cir. 2002) ................................23

*Gressett v. Cent. Ariz. Water Conservation Dist.*, No. CV 12-00185-PHX-JAT, 2012 WL 3028347 (D. Ariz. July 24, 2012)............................................................6

*Hartfield v. Or. State Bar*, No. 3:16-cv-00068-ST, 2016 WL 9225978, (D. Or. Jan. 15, 2016*), report and recommendation adopted*, 2016 WL 9226386 (D. Or. Feb. 16, 2016), *aff'd*, 671 Fed. Appx. 456 (9th Cir. 2016) .............................................3

*Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30 (1994) ........................ 3, 4, 5

*Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176 (9th Cir. 2003).......................2

*Hyland v. Wonder,* 117 F.3d 405 (9th Cir. 1997) ......................................................3

*In re Petition for a Rule Change to Create a Voluntary State Bar of Neb.*, 841 N.W.2d 167 (Neb. 2013) ........................................................................................5

*ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289 (9th Cir. 1993).......................1

*Janus v. AFSCME*, 138 S. Ct. 2448 (2018) ...................................................... passim

*Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) ................................................... passim

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994)............................1

*Lathrop v. Donohue*, 367 U.S. 820 (1961) ................................................... 13, 14, 16

*Lee v. City of L.A.*, 250 F.3d 668 (9th Cir. 2001) .....................................................24

*Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198 (9th Cir. 1988) ............. 2, 3, 4, 5, 6

*Morrow v. State Bar of Cal.*, 188 F.3d 1174 (9th Cir. 1999) ...................................14

*Savage v. Glendale Union High Sch., Dist. No. 205,* 343 F.3d 1036 (9th Cir. 2003) ................................................................................................... 3, 5, 9, 10, 11

*State ex rel. Frohnmayer v. Or. State Bar*, 307 Or. 304, 767 P.2d 893 (1989).......11

*Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499 (11th Cir. 1990) ................12

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...................................23

*Weidner v. Albertazzi*, No. 06-930-HO, 2006 WL 2987704 (D. Or. Oct. 13, 2006) 3

*Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92 (1st Cir. 2002) ........................7

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004)....................................................1

**Statutes**

28 U.S.C. § 636(b)(1)..................................................................................................1

ORS 9.010 ....................................................................................................... 9, 11, 12

ORS 9.010(5) ..............................................................................................................9

ORS 9.010(6) ..............................................................................................................3

ORS 9.025 ..................................................................................8

ORS 9.040 ..................................................................................8

ORS 9.055 ..................................................................................8

ORS 9.080 ..................................................................................8

ORS 9.080(4) ............................................................................12

ORS 9.210(1) ..............................................................................8

ORS 9.210(2) ..............................................................................7

ORS 9.210(3) ..............................................................................7

ORS 9.220 ..................................................................................7

ORS 9.250 ..................................................................................7

ORS 9.261 ..................................................................................7

ORS 9.490 ..................................................................................7

ORS 9.527 ..................................................................................7

ORS 9.532 ..................................................................................8

ORS 9.534 ..................................................................................8

ORS 9.536 ..................................................................................7

ORS 9.537 ..................................................................................9

ORS 9.542 ..................................................................................7

ORS 98.304 ..............................................................................10

ORS 98.386(2) ..........................................................................10

ORS 174.117(1) ........................................................................11

## Other Authorities

Alex Blasdel, *How the Resurgence of White Supremacy in the US Sparked a War Over Free Speech*, The Guardian (May 31, 2018) ...............................................22

Katherine Mangu-Ward, *'No Free Speech for Fascists' Is a Truly Terrible Idea*, Reason (Aug. 14, 2017) ...........................................................................................22

Marilyn Cavicchia, *Newly Formed California Lawyers Association Excited to Step Forward,* ABA Journal, Apr. 30, 2018....................................................................6

OSB Bylaws § 2.1(a) ...................................................................................................8

OSB Bylaws § 2.1(b) ...................................................................................................8

OSB Bylaws § 7.202.....................................................................................................8

OSB Bylaws § 29 ..........................................................................................................8

Ralph H. Brock, *"An Aliquot Portion of Their Dues:" A Survey of Unified Bar Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23 (2000) 16

Timothy E.D. Horley, *Rethinking the Heckler's Veto After Charlottesville*, 104 Va. L. Rev. Online 8 (2018) ............................................................................................22

## Rules

Fed. R. Civ. P. 12(b)(1)...................................................................................... 1, 2, 5

Fed. R. Civ. P. 12(b)(6)............................................................................ 1, 12, 24, 25

Ohio Gov. Bar R. VI § 14 ............................................................................................5

Plaintiffs Daniel Crowe and Lawrence Peterson respectfully make the following objections to the Findings and Recommendation entered in this matter on April 1, 2019. *See* Dkt. 29. For the reasons stated below, the Court should not follow the Recommendation, and this case should not be dismissed.

## LEGAL STANDARD

This Court applies de novo review when a party objects to a magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1).

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court must accept all of the complaint's factual allegations as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Also, the burden here is on the Defendants, not the Plaintiffs. Ordinarily, a jurisdictional attack under Rule 12(b)(1) would require the Plaintiffs to bear the burden of establishing the court's jurisdiction, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), but because the Defendants are asserting Eleventh Amendment immunity, which "does not implicate a federal court's subject matter jurisdiction in any ordinary sense," they bear the burden to prove that immunity applies. *ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1291 (9th Cir. 1993).

"Rule 12(b)(6) motions are viewed with disfavor." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). "When ruling on a 12(b)(6) motion, the complaint must be construed in the light most favorable to the plaintiff. The court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them." *Id.* (internal citations omitted).

**OBJECTIONS**

I.    **The Court should deny Defendants' motion to dismiss under Rule 12(b)(1) because the Oregon State Bar is not entitled to Eleventh Amendment immunity.**

Plaintiffs object to the Recommendation's conclusion that their claims against the Oregon State Bar ("OSB") should be dismissed under Rule 12(b)(1) on the basis of Eleventh Amendment immunity. *See* Recommendation at 10-16. The OSB lacks Eleventh Amendment immunity because it is not an "arm of the state" under the five-factor analysis that the Ninth Circuit prescribed in *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

Although state agencies are generally immune from suit in federal court, "an entity may be organized or managed in such a way that it does not qualify as an arm of the state entitled to sovereign immunity." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991). To determine whether an entity is an arm of the state, courts in this Circuit apply *Mitchell*'s five-factor test. *See, e.g., Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 778 (9th Cir. 2005) ("In the Ninth Circuit, we employ a five-factor test to determine whether an entity is an arm of the state."); *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1181 (9th Cir. 2003) ("These factors must be analyzed in light of the way [state] law treats the governmental agency") (internal marks omitted). Under that test, a court must weigh:

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity.

*Mitchell*, 861 F.2d at 201. In this case, contrary to the Recommendation's analysis, all five factors weigh *against* Eleventh Amendment immunity for the OSB.[1]

---

[1] The Recommendation cited several decisions that stated that the OSB was entitled to Eleventh Amendment immunity, but those decisions did not perform *Mitchell*'s five-factor analysis and, in

## A.    A money judgment against the OSB would not be satisfied out of state funds.

The first *Mitchell* factor weighs against immunity because a judgment against the OSB would not be paid out of state funds. "[W]hen a state entity is structured so that its obligations are its own special obligations and not general obligations of the state, that fact weighs against a finding of sovereign immunity." *Durning,* 950 F.2d at 1425–26; *see also Hyland v. Wonder,* 117 F.3d 405, 414 (9th Cir. 1997) (defendants not immune under Eleventh Amendment when they did not present "any evidence that the state would be liable for the judgment").

The Supreme Court and the Ninth Circuit have found the first *Mitchell* factor to be the most important: Because the "impetus for the Eleventh Amendment [is] the prevention of federal-court judgments that must be paid out of a State's treasury … the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 48 (1994) (citations omitted); *see also Savage v. Glendale Union High Sch., Dist. No. 205,* 343 F.3d 1036, 1041 (9th Cir. 2003) ("[T]he first *Mitchell* factor is the most important component in establishing Eleventh Amendment immunity." (citations omitted)); *Durning,* 950 F.2d at 1424 (same).

Here, this most important factor weighs against immunity because a money judgment against the Bar would not be satisfied out of state funds. *See* ORS 9.010(6). The

---

any event, are district court opinions, unpublished, or both, and therefore do not bind the Court in this case. *See* Recommendation 11, citing *Eardley v. Garst*, No. 99-36057, 232 F.3d 894, 2000 WL 1029087 (9th Cir. 2000) (unpublished table opinion); *Hartfield v. Or. State Bar*, No. 3:16-cv-00068-ST, 2016 WL 9225978, at *1 (D. Or. Jan. 15, 2016)*, report and recommendation adopted*, 2016 WL 9226386 (D. Or. Feb. 16, 2016), *aff'd*, 671 Fed. Appx. 456 (9th Cir. 2016); *Coultas v. Payne*, No. 3:12-cv-1132-AC, 2012 WL 6725845, at *3 (D. Or. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6726247, at *1 (D. Or. Dec. 27, 2012); *Weidner v. Albertazzi*, No. 06-930-HO, 2006 WL 2987704, at *1 (D. Or. Oct. 13, 2006); *Erwin v. Oregon ex rel. Kitzhaber*, 231 F.Supp.2d 1003, 1007 (D. Or. 2001), *aff'd*, 43 Fed. Appx. 122 (9th Cir. 2002)). In the absence of binding precedent, *Mitchell* requires the Court to conduct its own analysis of the five factors.

Recommendation correctly acknowledged this but then downplayed the factor's importance, apparently because it found that "the Bar performs essential governmental functions including the collection of fees to perform those functions" and that a judgment against the OSB "would come from the Bar's collection of fees that is made possible because the State authorized the Bar to collect those fees." Recommendation at 12-13. The Recommendation erred in relying on those facts because they have nothing to do with the first *Mitchell* factor, which is concerned only with protecting *state* treasury funds from federal-court judgments. *See Hess*, 513 U.S. at 48. Of course state law may charge entities, such as local governments, with certain functions and authorize them to collect revenue, but that does not make those entities' funds "state funds" for purposes of the first *Mitchell* factor. *Cf. Beentjes*, 397 F.3d at 776, 778-81 (first factor weighed against immunity for pollution control district, even though the district was created by state law and the state collected revenue on its behalf, because judgment would not be paid out of "state funds").

The Recommendation erred in citing a Seventh Circuit decision in which, supposedly, "the effect on the state treasury was the least important factor" in determining whether an entity had Eleventh Amendment immunity. Recommendation at 12 n.3 (citing *Crosetto v. State Bar of Wis.*, 12 F.3d 1396, 1402 (7th Cir. 1993)). In fact, *Crosetto* does not describe this as the "least important factor" but merely says that it may not be decisive. 12 F.3d at 1402. Indeed, the court was specific in telling the district court that "whether a judgment against the State Bar would ultimately be paid by the state's treasury" would be "relevant" to its inquiry on remand. *Id.* If *Crosetto* had deemed this factor the "least important," that would have directly contradicted

Supreme Court and Ninth Circuit precedent establishing this as the *most* important factor. *See Hess*, 513 U.S. at 48; *Savage*, 343 F.3d at 1041.[2]

The Recommendation also erred in concluding that "as a practical matter, plainitffs' success in these actions will impact the State treasury" because supposedly "the Oregon Supreme Court would be left to carry out the regulatory function which would certainly impact the State's funding". Recommendation at 13 n.4. First, this is irrelevant to the *Mitchell* analysis, which is concerned only with "whether a *money judgment* would be satisfied out of state funds." 861 F.2d at 201 (emphasis added). Here, Plaintiffs only seek refunds of mandatory dues they paid, which—it is undisputed—would not be paid out of the state treasury. Compl. (Dkt. 1) ¶ 15. Second, the Recommendation had no basis for concluding that granting Plaintiffs declaratory and injunctive relief would impact the state treasury. There is no evidence before the Court on this point, but the experience of other states shows that the Recommendation's conclusion is incorrect. If Plaintiffs prevail, Oregon could still compel lawyers to pay for the cost of their own regulation, just as the many states that currently lack a mandatory bar association do, through either: (1) a fee paid to the Oregon Supreme Court, *see, e.g.,* Ohio Gov. Bar R. VI § 14[3]; or (2) as in California and Nebraska, a fee paid to a bar association that is limited to using mandatory regulatory fees for specified regulatory activities that do not include political or ideological speech. *See In re Petition for a Rule Change to Create a Voluntary State Bar of Neb.*, 841

---

[2] If anything, *Crosetto* shows that the Recommendation erred in recommending dismissal of Plaintiffs' claims against OSB under Rule 12(b)(1) before the parties could develop a factual record. The court stated that whether a particular bar association "is vested with sufficient state characteristics to qualify for sovereign immunity is a factual question … that cannot be answered" without a developed record on that issue and remanded the case to the district court for further proceedings. *Crosetto*, 12 F.3d at 1402.

[3] http://www.supremecourt.ohio.gov/LegalResources/Rules/govbar/govbar.pdf.

N.W.2d 167, 173 (Neb. 2013); Marilyn Cavicchia, *Newly Formed California Lawyers Association Excited to Step Forward,* ABA Journal, Apr. 30, 2018.[4]

The Court should therefore decline to follow the Recommendation on this point and should conclude that the first *Mitchell* factor weighs against Eleventh Amendment immunity.

### B.    The OSB does not perform central government functions.

The Recommendation also erred in concluding that the second *Mitchell* factor—whether the OSB performs a central governmental function—favors immunity. *See* Recommendation at 13-15. This factor weighs against immunity because the OSB performs independent corporate functions with minimal state control.

"In assessing the second *Mitchell* factor … [a court] evaluate[s] whether the [entity] addresses a matter of statewide rather than local or municipal concern, and the extent to which the state exercises centralized governmental control over the entity." *Beentjes,* 397 F.3d at 782 (internal marks and citations omitted). Where some of an entity's activities may involve a central government role but others do not, this factor may not weigh for or against immunity. *See, e.g., Gressett v. Cent. Ariz. Water Conservation Dist.*, No. CV 12-00185-PHX-JAT, 2012 WL 3028347, at *3 (D. Ariz. July 24, 2012) (where entity acted "[i]n some ways … in a central government role" but also conducted activities "not usually assigned to the central government," second factor did not indicate whether it should be treated as an arm of the state).

The Supreme Court has recognized that a bar association is *not* a typical government agency, does not perform key governmental functions related to regulating the practice of law, and therefore is not entitled "to the treatment accorded a governor, a mayor, or a state tax

---

[4] https://www.americanbar.org/groups/bar_services/publications/bar_leader/2017-18/may-june/born-by-legislative-decision-california-lawyers-association-excited-to-step-forward/.

commission" under federal constitutional law. *Keller v. State Bar of Cal.*, 496 U.S. 1, 11 (1990). In *Keller*, the Court observed that the State Bar of California "is a good deal different from most other entities that would be regarded in common parlance as 'governmental agencies.'" *Id.* It is funded primarily by members, not taxpayers, and its "services," however valuable, "are essentially advisory in nature": it "does not admit anyone to the practice of law, it does not finally disbar or suspend anyone, and it does not ultimately establish ethical codes of conduct" because "[t]hose functions are reserved by California law to the State Supreme Court." *Id.*

It is the same in Oregon: while the OSB may make recommendations, the Oregon Supreme Court is not bound to accept them and *it*, not OSB, is the body actually responsible for admitting attorneys (ORS 9.210(2), 9.250), accepting attorney resignations (ORS 9.261), adopting rules of professional conduct (ORS 9.490), approving application fees (ORS 9.210(3)), disciplining attorneys (ORS 9.536), and approving rules of procedure for investigations of attorneys and bar applicants (ORS 9.542). Further, criteria for bar admission and attorney discipline are set by statute, not by the OSB. *See* ORS 9.220, 9.527. The Recommendation's statement that the Oregon Supreme Court's retention of authority in these matters makes OSB's activities no "less governmental in form," Recommendation at 14 n.5, is erroneous because it is at odds with *Keller*, which concluded that the California Supreme Court's ultimate authority in these areas rendered the State Bar of California unlike a government agency, and analogous to a public-sector union, for federal constitutional purposes. *See Keller*, 496 U.S. at 11.

Otherwise, the OSB mostly conducts its activities independently, not under centralized state control. It has complete autonomy in determining how the OSB's general responsibilities are carried out, which weighs against a finding that it performs a "centralized governmental" function. *See, e.g., Beentjes*, 397 F.3d at 783 & n.9; *Wojcik v. Mass. State Lottery Comm'n*, 300

F.3d 92, 101 (1st Cir. 2002) (assessing, among other things, "whether the state exerts control over the agency, and if so, to what extent"). OSB acts under the management and control of its Board of Governors—elected by OSB's active members—not the state, which also weighs against such a conclusion. ORS 9.025, 9.040. The Board appoints the OSB's Chief Executive Officer. ORS 9.055. The Board is charged with the executive functions of the OSB, and the Board has the power to adopt, alter, amend, and repeal bylaws related to the regulation and management of the OSB. ORS 9.080. Under the Board's supervision (alone), the OSB's CEO implements, administers, and supervises the OSB's operation and program activities. OSB Bylaws § 2.1(a). The Board operates as a review body, a supervisor of top management performance and a representative body of all members. Bylaws § 2.1(b). The Board may amend the OSB's responsibilities and Bylaws without Judicial Department review or concurrence. *See* Bylaws § 29. The Oregon Supreme Court does appoint a professional responsibility board that institutes the OSB's disciplinary proceedings (ORS 9.532, 9.534), as well as a board of bar examiners (ORS 9.210(1)), but it does not control those boards' operation.

The Recommendation erred in stating that "[t]he Supreme Court also approves the Bar's budget for admissions, discipline, and continuing legal education programs in conjunction with the budgets of other Bar activities. Bylaws § 7.202." Recommendation at 14. In fact, the OSB itself "establish[es] each year the budget of the [OSB's] admissions, discipline and Minimum Continuing Legal Education programs in conjunction with the budgets of the other activities of the [OSB]," while the Supreme Court is limited to approving only the budget related to "admissions, discipline and Minimum Continuing Legal Education" – not "other activities." Bylaws § 7.202.

Because the ultimate *governmental* authority for regulating the legal profession lies with the Oregon Supreme Court, not OSB, and the OSB acts independently of the state in exercising its own functions, the second *Mitchell* factor weighs against a finding of immunity.

### C.    The OSB may sue and be sued.

The Recommendation rightly recognized that the OSB can sue and be sued under ORS 9.010(5). Recommendation at 15. This should have led the Recommendation to conclude that the third *Mitchell* factor weighs against immunity. *See Savage*, 343 F.3d at 1048-49 (school districts' "power to sue or be sued in their own name … weigh[ed] against" immunity). Nonetheless, the Recommendation concluded that "this factor does not argue against immunity from suit in federal court" because state law grants the OSB, its officers, and related entities immunity from civil liability for certain activities. Recommendation at 15, citing ORS 9.537. But the OSB's statutory immunity against certain civil actions is irrelevant to the third *Mitchell* factor, which considers only whether an entity can sue and be sued in its own capacity—i.e., separately from the state government. *See Savage*, 343 F.3d at 1049 (entity's capacity to be sued "was underscored … by the absence of the [state] Attorney General's participation in the lawsuit"). There is no dispute that the OSB *is* such an entity, and the Recommendation therefore erred in not concluding that this factor weighs against immunity.

### D.    The OSB may take property in its own name, not the name of the state.

In analyzing the fourth *Mitchell* factor—whether the OSB can take property in its own name—the Recommendation again acknowledged that the factor *should* weigh against immunity but then erroneously concluded that it did not. The Recommendation correctly acknowledged that the OSB has the power to take property in its own name under ORS 9.010 and that this should weigh against immunity. Recommendation at 15, citing *Beentjes*, 397 F.3d at 784.

Nevertheless, the Recommendation ultimately concluded that this factor "fails to demonstrate lack of immunity" for OSB, apparently because the OSB's power to take property is "in furtherance of its objectives which are classified as governmental functions" and because "while the Bar may take possession of abandoned client funds held in trust accounts, those funds belong to the State." Recommendation at 15-16, citing ORS 98.386(2), 98.304.

The Recommendation erred by focusing on OSB's supposed use of its property for "governmental functions," which might be relevant to the second factor of the *Mitchell* analysis but has no bearing on the fourth factor, which is concerned only with whether an entity "has power to hold property in its own name" rather than the state's name. *Savage*, 343 F.3d at 1049. Further, the Recommendation's finding that abandoned client funds in the OSB's possession "belong to the State" was erroneous; the cited statutes do not support it. *See* ORS 98.386(2) ("amounts identified … shall be paid or delivered … to the Oregon State Bar" and "[a]ll amounts paid or delivered to the Oregon State Bar … are continuously appropriated to the Oregon State Bar."). And the state's imposition of certain responsibilities on the OSB in exchange for receiving certain abandoned client funds is irrelevant to the question of whether the OSB can take property in its own name. *See Savage*, 343 F.3d at 1049-50 (school district could hold property in its own name, and the fourth *Mitchell* factor weighed against immunity, notwithstanding state legislation controlling the district's use of certain monies and the state's provision of certain property with "restrictions attached"). Again, it is beyond dispute that it can.

**E.    The OSB's corporate status weighs against immunity.**

Finally, the Recommendation erred in concluding that the OSB's corporate status favors immunity based on a statute declaring the OSB to be "a public corporation and an instrumentality of the Judicial Department of the government of the State of Oregon," ORS

9.010, and a court decision that identified the OSB as a "state agency" under the Oregon Public

Records Law's definition of that term, *State ex rel. Frohnmayer v. Oregon State Bar*, 307 Or.

304, 309, 767 P.2d 893, 895 (1989). *See* Recommendation at 16.

The Recommendation erred in treating the state's description of the OSB as dispositive.

In *Keller*, the Supreme Court made clear that a state's categorization of a bar association as a

"government" entity is not conclusive for purposes of federal constitutional law. The Court

explained that, while "the Supreme Court of California is the final authority on the

'governmental' status of the State Bar of California for purposes of state law, … its

determination that [the Bar] is a 'government agency,' and therefore entitled to the treatment

accorded a governor, a mayor, or a state tax commission, for instance, is not binding on [federal

courts] when such a determination is essential to the decision of a federal question." 496 U.S. at

11. *Keller* then concluded that, for First Amendment purposes, a mandatory state bar association

is more analogous to a labor union than to any kind of governmental unit. *Id.*

Moreover, the Recommendation disregarded Oregon's classification of "[a] public

corporation created under a statute of this state and specifically designated as a public

corporation," such as the OSB, as a "special government body." ORS 174.117(1). Other

examples of special government bodies in Oregon include school districts, education service

districts, intergovernmental bodies formed by two or more public bodies, and entities created by

statute, ordinance or resolution that are not part of state or local government. ORS 174.117(1).

Inclusion of OSB as a special government body is telling: in general, special government bodies

are more localized or otherwise separate and distinct from state government—i.e., the very kinds

of entities that do *not* enjoy Eleventh Amendment immunity. *See, e.g., Beentjes*, 397 F.3d at 786

(county air pollution control district not an arm of the state); *Savage*, 343 F.3d 1036 (school

district); *Eason v. Clark Cnty. Sch. Dist.*, 303 F.3d 1137, 1144 (9th Cir. 2002) (same); *Durning*, 950 F.2d at 1428 (statutorily created Community Development Authority); *Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1511 (11th Cir. 1990) (county school board).

Further, the OSB is exempt from most requirements that apply to state agencies, departments, boards, commissions, and public bodies, and its employees are not state employees.[5] *See* ORS 9.010, 9.080(4). And, again, OSB is supervised by its Board and enforces the Board's Bylaws. The state's minimal control over the OSB points towards independence from the state. *See Beentjes*, 397 F.3d at 785 ("the State exercises little control over the structure and operation of the districts, which suggests that districts function independently from the State") (internal quotations omitted).

Therefore, the Recommendation erred in not concluding that the final *Mitchell* factor—like all of the other *Mitchell* factors—weighs against a finding of Eleventh Amendment immunity for the OSB.

**II.    The Court should deny Defendants' motion to dismiss under Rule 12(b)(6) because Plaintiffs have stated claims for violations of their First and Fourteenth Amendment rights.**

Plaintiffs object to the Recommendation's conclusion that their claims should be dismissed under Fed. R. Civ. P. 12(b)(6). Plaintiffs have stated valid First and Fourteenth Amendment claims challenging Oregon's mandatory bar membership, the OSB's use of fees for political and ideological speech without members' affirmative consent, and the OSB's lack of procedures to ensure that members' First Amendment rights are respected.

---

[5] For example, the state does not list the individual Defendants in this case as state employees with respect to their positions with the OSB or its Board. *State Employee List (Alphabetical),* available at https://dasapp.oregon.gov/statephonebook/personnellisting.pdf.

PLS.' OBJECTION TO FINDINGS & RECOMMENDATION - 12

**A.    Plaintiffs have stated a First and Fourteenth Amendment claim against mandatory OSB membership.**

Defendants' motion to dismiss should be denied with respect to Plaintiffs' Third Claim for Relief because it states a valid First and Fourteenth Amendment claim challenging Oregon's mandatory bar membership. Compl. ¶¶ 80-89. The Supreme Court has made clear that "[t]he right to eschew association for expressive purposes" is "protected" by the First Amendment. *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018). Therefore, forcing Plaintiffs to join the OSB as a condition of practicing law infringes on their First Amendment right to freedom of association. And Defendants have not justified that infringement by showing, as they must, that it "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Id*. at 2465.

**1.    Supreme Court precedent does not foreclose Plaintiffs' claim.**

Plaintiffs object to the Recommendation's erroneous conclusion that Supreme Court precedent forecloses any challenge to mandatory bar association membership and fees. *See* Recommendation at 17-21.

*Keller* does not foreclose Plaintiffs' challenge to mandatory bar membership because that case did not actually decide the constitutionality of mandatory bar membership. Rather, *Keller* assumed, without deciding, that compulsory membership requirements are valid, citing *Lathrop v. Donohue*, 367 U.S. 820 (1961). *Keller*, 496 U.S. at 7-9. *Keller* then decided a narrower question: whether an attorney's "free speech rights were violated by the [state] Bar's use of his mandatory dues to support objectionable political activities"—a question it answered in the affirmative. *Id.* at 9.

*Keller* expressly declined to address the "broader freedom of association" question presented by Plaintiffs' Third Claim for Relief: whether attorneys can "be compelled to associate

with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood* [*v. Detroit Board of Education*, 431 U.S. 209 (1977)]." *Keller*, 496 U.S. at 17. The Court stated that lower "courts remain[ed] free … to consider this issue." *Id.* The Ninth Circuit has since acknowledged that *Keller* "reserved" this issue for resolution in a future case. *Morrow v. State Bar of Cal.*, 188 F.3d 1174, 1177 (9th Cir. 1999). And, to date, no Supreme Court or Ninth Circuit decision has resolved the issue—which means that this Court may do so in this case.

As for *Lathrop*, it did not resolve the mandatory-membership question, either. The plurality decision stated that it was addressing "only … a question of compelled financial support of group activities, not … involuntary membership in any other aspect." *Lathrop*, 367 U.S. at 828 (plurality opinion). Both *Keller* and *Morrow* expressly recognized that *Lathrop* did not address the "much broader freedom of association claim" presented here. *Keller*, 496 U.S. at 17; *Morrow*, 188 F.3d at 1177.

The Recommendation therefore erred in concluding that *Keller* and *Lathrop* controlled and foreclosed Plaintiffs' claim challenging mandatory OSB membership.

> 2.    **Dismissal is improper because Defendants have not shown that mandatory bar membership satisfies exacting First Amendment scrutiny.**

Because Supreme Court precedent does not foreclose Plaintiffs' Third Claim for Relief, the Court should subject Oregon's membership requirement to the exacting First Amendment scrutiny the Supreme Court prescribed for laws mandating association for expressive purposes in *Janus*. Under exacting scrutiny, Defendants must show that mandatory OSB membership "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." 138 S. Ct. at 2465.

Defendants have not satisfied their burden; indeed, they have not even attempted to show that the state cannot achieve the only purpose mandatory OSB membership might legitimately serve— "regulating the legal profession and improving the quality of legal services," *Keller*, 496 U.S. at 13—by significantly less restrictive means. Further, it is obvious that Oregon *can* serve its interest in regulating the legal profession and improving the quality of legal services without forcing attorneys to join the OSB.

On this point, *Janus*'s details are instructive. In *Janus*, the government argued that compelling public-sector workers to subsidize a union with mandatory fees was necessary to serve the state's interest in "labor peace." *Janus*, 138 S. Ct. at 2465. The "labor peace" theory held that compelling public-sector workers to subsidize a union was necessary because of the union's designation as workers' exclusive bargaining representative. Without compulsory union fees, the theory went, the union would not be able to act as the sole bargaining representative, and the result would be "pandemonium" caused by conflicts between different unions. *Id. Janus* found that assumption "simply not true," *id.*, because, in fact, several federal entities and states designated public-sector unions as exclusive representatives without compelling workers to pay union fees, and no such "pandemonium" had resulted. Therefore, it is "undeniable that 'labor peace' can readily be achieved 'through means significantly less restrictive of associational freedoms' than the assessment of agency fees"—and those fees cannot survive exacting scrutiny. *Id.* at 2466 (citation omitted).

As Plaintiffs have alleged in their Complaint, Oregon's mandatory bar fails exacting scrutiny for the same reason: the state can achieve its goals for the legal profession without mandating bar membership or dues. Compl. ¶ 86. It is obvious as a theoretical matter how the state could do so: by acting as a regulator, penalizing those who break the rules, and providing

educational services to ensure that practitioners know the rules—just as it already does for countless other trades. And, in fact, some 20 states and Puerto Rico already regulate the practice of law without requiring membership in a state bar association that may use member fees for political and ideological speech. *Id.* ¶ 87. This includes states with large populations of lawyers, such as Massachusetts, New York, and New Jersey, and states with some of the smallest bars, such as Vermont and Delaware. Ralph H. Brock, *"An Aliquot Portion of Their Dues:" A Survey of Unified Bar Compliance with Hudson and Keller*, 1 Tex. Tech J. Tex. Admin. L. 23, 24 n.1 (2000).[6] If those states can regulate lawyers and improve the quality of legal services without violating attorneys' First Amendment rights with a mandatory bar, so can Oregon.

The Court should therefore decline to follow the Recommendation with respect to dismissal of Plaintiffs' Third Claim for Relief and allow the claim to proceed.

### B. Plaintiffs have stated a First and Fourteenth Amendment claim challenging OSB's use of mandatory fees for political and ideological speech and other non-germane activities without members' affirmative consent.

The Court should deny Defendants' motion to dismiss—and decline to accept the Recommendation's conclusions—with respect to Plaintiffs' Second Claim for Relief, which states a valid First and Fourteenth Amendment claim challenging the OSB's use of mandatory member dues for political and ideological speech and other non-chargeable activities without members' affirmative consent. Compl. ¶¶ 73-79. In particular, Plaintiffs object to the Recommendation's conclusion that *Keller* and *Lathrop* preclude their challenge to the OSB's use

---

[6] This article from 2000 identifies 18 such states, but, as noted above, Nebraska and California have since changed their rules to require the state's bar association to use mandatory fees only for several specified regulatory functions, not for any political or ideological speech, mitigating if not eliminating any First Amendment harm.

of mandatory fees for political and ideological speech and other non-chargeable activities without members' affirmative consent. *See* Recommendation at 17-21.

In *Keller*, the Supreme Court concluded that, for First Amendment purposes, a mandatory bar association is more analogous to a public-sector union than to an ordinary government agency and therefore should be "subject to the same constitutional rule with respect to the use of compulsory dues as are labor unions representing public and private employees." 496 U.S. at 11-13. Therefore, just as a "a union could not expend a dissenting individual's dues for ideological activities not 'germane' to … collective bargaining" under *Abood*, 431 U.S. at 235-36, so a state bar could "constitutionally fund activities germane to [regulating the legal profession and improving the quality of legal services] out of the mandatory dues of all members" but could not use mandatory dues to "fund activities of an ideological nature which fall outside" of the bar's regulatory purpose. *Keller*, 496 U.S. at 13-14.

In *Janus*, the Supreme Court overruled *Abood* because that decision "judged [mandatory public-sector union fees'] constitutionality … under a deferential standard that finds no support in [the Court's] free speech cases" instead of subjecting them to exacting scrutiny. *Janus*, 138 S. Ct. at 2479-80. And, as discussed above, *Janus* concluded that mandatory union fees could not survive exacting scrutiny because the government did not show that they were necessary to serve its interest in labor peace. *Id.* at 2466. The Court then concluded that the only way to avoid violating workers' First Amendment rights is to not take union fees from them without their affirmative consent. *Id.* at 2486.

*Keller,* like *Abood*, never subjected mandatory fees to the exacting scrutiny the First Amendment requires. *Cf. Janus*, 138 S. Ct. at 2479-80. Now, with *Abood* overruled, there is no

foundation for *Keller*'s toleration of bar associations using mandatory dues for political or ideological speech without affirmative consent.

Contrary to the Recommendation's assumption, however, this Court need not conclude that the Supreme Court has overruled *Keller*, nor disregard *Keller* itself, to consider whether the OSB's mandatory fees violate the First Amendment. *See* Recommendation at 20. After *Janus*, if courts are to treat bar associations like public-sector unions—as *Keller* prescribes—then they must subject mandatory bar association fees to exacting scrutiny.

Those fees cannot survive exacting scrutiny because, as discussed above, the government can regulate the legal profession and improve the quality of legal services without forcing lawyers to join or pay a bar association. And, in any event, Defendants have not shown at this stage that the OSB's use of fees without affirmative consent survives exacting scrutiny—and therefore, contrary to the Recommendation's conclusion, they are not entitled to dismissal of Plaintiffs' Second Claim for Relief.

> **C.    Plaintiffs have stated a First and Fourteenth Amendment claim challenging OSB's lack of safeguards to ensure member fees are not used for non-germane activities.**

The Court should deny Defendants' motion to dismiss—and decline to follow the Recommendation—with respect to Plaintiffs' First Claim for Relief, which challenges OSB's lack of safeguards to ensure that members' mandatory dues are not used for political and ideological speech and other non-germane activities (assuming, in the alternative to Plaintiffs' other claims, that mandatory bar membership and dues are permissible at all). Compl. ¶¶ 61-72. The Recommendation erred in concluding that the OSB provides the safeguards *Keller* requires. *See* Recommendation at 21-26.

In *Keller*, the Supreme Court held that mandatory bar dues may only be used for activities "germane" to "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13. The Court held that using mandatory dues to "fund activities of an ideological nature which fall outside of those areas of activity" violates members' First Amendment right to freedom of speech and association. *Id.* at 14.

Under *Keller*, a bar association can meet its constitutional obligation to ensure that members are not forced to pay for such non-germane activities by providing: (1) "an adequate explanation of the basis for the [mandatory bar association] fee"; (2) "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker"; and (3) "an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 16 (citation and internal marks omitted). This is the same "minimum set of procedures" (*id.* at 17) the Supreme Court prescribed for public-sector unions—to ensure that non-members' mandatory union fees were not used for political or ideological activity not germane to the union's representation activities—in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). *Keller* left open the question of "whether one or more alternative procedures would likewise satisfy" a bar association's constitutional obligation, 496 U.S. at 17—but in the three decades since *Keller*, the Court has not identified a satisfactory alternative to *Hudson*'s minimum.

Plaintiffs have alleged that OSB fails to satisfy the first *Hudson* requirement: it does not provide members with an explanation of how their mandatory dues amount is calculated. Compl. ¶ 66. Indeed, Plaintiffs allege that OSB publishes no information about whether or how it determines whether a given allocation of funds was for purposes germane to improving the quality of legal services and regulating attorneys. *Id.* ¶ 34. OSB therefore provides its members with no way to know how the OSB determines what portion of its expenses are chargeable to

members as part of their mandatory dues; it "leav[es members] in the dark about the source of"
their mandatory dues amount. *Hudson*, 475 U.S. at 306. And by denying members information
about how their dues are calculated, it denies them a meaningful opportunity to challenge the
calculation of their dues amount and protect their First Amendment rights. *See id.*

 Plaintiffs have also alleged that the OSB's Bylaws do not satisfy the second *Hudson*
requirement because they do not provide for an escrow for amounts reasonably in dispute while a
member's challenge to an expenditure is pending. *See Keller*, 496 U.S. at 16.

 The Recommendation erred in concluding that the OSB provides members with an
adequate explanation of their fee. As the Recommendation itself recognized, "[t]he basis for
[OSB's mandatory] fee does not present itself until a Bar member objects." Recommendation at
25. *Hudson*, however, requires explanation of a fee's basis *before* a member objects because
"[l]eaving the [fee payers] in the dark about the source of the figure for the … fee—and
requiring them to object in order to receive information—does not adequately protect"
individuals' First Amendment rights. 475 U.S. at 306. The Bar's "annual accounting of both
projected and actual expenses," Recommendation 25, does not suffice because it contains no
specific information about the OSB's expenditures—only general categories—and contains no
information about whether or how the OSB determined whether any given expenditures were
chargeable. *See* Compl. ¶¶ 32-34. The OSB's supposed "policy [that] already mandates that all
communications must be germane," Recommendation at 25, is likewise inadequate to protect
First Amendment rights; *Hudson* and *Keller* require safeguards so individuals can ensure their
rights are respected instead of having to take their union or bar association's word for it.

 The Recommendation also erred in concluding that OSB's "procedure satisfies the
escrow requirement." Recommendation at 25. Defendants have not even alleged that the OSB

puts disputed funds in escrow. The OSB's provision of a refund with interest after a dispute is resolved, *see id.*, is necessary but not sufficient to protect members' First Amendment rights. *Keller* and *Hudson* specifically require escrow—nothing less—to *guarantee* that no amount of a member's money will be used for non-germane political or ideological speech for any length of time in violation of fundamental First Amendment rights. *See Keller*, 496 U.S. at 16; *Hudson*, 475 U.S. at 310. Indeed, *Hudson* specified that, if a union chooses to escrow only a portion, rather than all, of an objecting individual's annual fees, then "it must carefully justify the limited escrow on the basis of [an] independent audit, and the escrow figure must itself be independently verified." *Hudson*, 475 U.S. at 310 n.23. That rule is incompatible with the Recommendation's conclusion that escrow isn't necessary *at all* as long as an organization has a refund policy. Recommendation at 24–25.

The Court therefore should decline to follow the Recommendation with respect to dismissal of Plaintiffs' First Claim for Relief and allow the claim to proceed.

**III.    Plaintiffs object to the Recommendation's conclusions about the *Bar Bulletin* statements to which they objected.**

Finally, Plaintiffs object to the Recommendation's conclusions regarding the propriety of OSB's use of members' mandatory dues to publish certain statements in its *Bar Bulletin*.

In the April 2018 *Bar Bulletin*, the OSB published, on opposing pages, two statements on alleged "white nationalism," one of which criticized President Donald Trump for, among other things, allegedly "allowing [the white nationalist movement] to make up the base of his support" and for signing an executive order restricting immigration and refugee admissions. Compl. ¶¶ 42-43 & Exh. A at 2. Upon discovering this, Plaintiffs Crowe and Peterson voiced their objection and sought a refund of their dues. *Id.* ¶¶ 46-50. In response to their objections, Crowe and Peterson each received a partial dues refund from OSB in the amount of $1.15—calculated as

$1.12, plus $0.03 of statutory interest. *Id.* ¶ 51. Other OSB members also objected to the statements and likewise received partial dues refunds. *Id.* ¶ 52. OSB has not informed Crowe and Peterson how it calculated the amounts of these alleged partial dues refunds. *Id.* ¶ 53.

The *Bar Bulletin* statements are relevant to Plaintiffs' claims inasmuch as they show that the OSB has used mandatory member dues for political and ideological speech, including speech that is not germane to improving the quality of legal services and regulating the legal profession.

The Recommendation erred in concluding that the first *Bar Bulletin* statement, attributed to the OSB itself, was "germane to improving the quality of legal services." Recommendation at 21. To the contrary, the statement opined on a highly controversial legal and political issue—the extent to which speech that supposedly incites violence should be restricted—by "condemn[ing] the proliferation of speech that [supposedly] incites … violence" and suggesting that, notwithstanding the First Amendment, something must be done "to address speech" that supposedly "incites violence." Compl. Exh. A at 1. That issue was a subject of much public debate in the wake of the Charlottesville events that both *Bar Bulletin* statements also referenced. *See, e.g.,* Alex Blasdel, *How the Resurgence of White Supremacy in the US Sparked a War Over Free Speech*, The Guardian (May 31, 2018)[7] (describing debate within the ACLU and among others); Timothy E.D. Horley, *Rethinking the Heckler's Veto After Charlottesville*, 104 Va. L. Rev. Online 8 (2018)[8] (stating that "current doctrine provides no clear answer" on when government may limit speech that may provoke a violent response and proposing a new First Amendment standard); Katherine Mangu-Ward, *'No Free Speech for Fascists' Is a Truly*

---

[7] https://www.theguardian.com/news/2018/may/31/how-the-resurgence-of-white-supremacy-in-the-us-sparked-a-war-over-free-speech-aclu-charlottesville.
[8] http://www.virginialawreview.org/volumes/content/rethinking-hecklers-veto-after-charlottesville.

PLS.' OBJECTION TO FINDINGS & RECOMMENDATION - 22

*Terrible Idea*, Reason (Aug. 14, 2017)[9] (criticizing calls for speech restrictions in response to Charlottesville events). Further, it appears that the OSB intended the first statement to be read in conjunction with the second statement, which OSB chose to publish next to it, which blames "the current climate of violence, extremism and exclusion" on President Trump. Compl. Ex. A.

The Recommendation erroneously concluded that the use of mandatory dues to publish the first statement was not prohibited by *Keller* because any expression of a political or ideological viewpoint was "within the specific context of promotion of access to justice, the rule of law, and a healthy and functional judicial system." Recommendation at 21. But that rule is unworkable. If a legal or political view is considered germane as long it is placed in that "context," then virtually nothing is off limits. Competent lawyers will *always* be able to argue that their own political views promote "justice, the rule of law, and a healthy and functional judicial system." If "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), then the Magistrate can certainly not uphold the use of mandatory dues to support a political statement on the theory that that statement fits within an officially acceptable range of public opinion. The Court should decline to recognize this exception that would swallow *Keller*'s First Amendment rule.

Contrary to the Recommendation's analysis, the first statement is not comparable to the dues-funded advertising campaign approved in *Gardner v. State Bar of Nevada*, 284 F.3d 1040 (9th Cir. 2002). *See* Recommendation at 21-22. There the court concluded that a bar association could use mandatory dues to fund advertisements with the slogan "Nevada Lawyers—Striving to Make The Law Work for Everyone" because the campaign was aimed directly at "foster[ing]

---

[9] https://reason.com/blog/2017/08/14/no-free-speech-for-fascists-is-a-bad-dan.

public understanding" of the legal system. *Id.* at 1042-43. Unlike the *Bar Bulletin* statements, that campaign did not include criticism of public officials or expression of viewpoints on controversial issues not directly related to the practice of law.

The Recommendation erred in concluding that the second *Bar Bulletin* statement, attributed to "seven affinity bars," was permissible because supposedly "the *Bar Bulletin* routinely publishes statements from a variety of authors with differing political viewpoints and creates a forum for the exchange of ideas pertaining to the practice of law." Recommendation at 22. Nothing before the Court supported the finding that the *Bar Bulletin* provides a "forum" for "differing political viewpoints." In considering a 12(b)(6) motion, the Court may only consider the facts alleged in the complaint, accepting them as true and construing them in the light most favorable to the plaintiffs. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (reversing dismissal where the district court "assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings [and] took judicial notice of the truth of disputed factual matters"). Neither the allegations of the Complaint, nor anything else presented to the Court, supported the "forum" finding. Nor is there anything before the Court suggesting that the OSB has offered *anyone* the opportunity to present "differing political viewpoints" with respect to the April 2018 statements criticizing the President in particular.

Of course, the existence of such an opportunity would not diminish the First Amendment harm caused by expenditure of mandatory dues to propagate political opinions that members disagree with; on the contrary, it would double that harm. The Recommendation's conclusion that the use of Plaintiffs' bar dues to publish political or ideological speech would be constitutional if it were in the context of a "forum" in which "differing political viewpoints" were expressed was therefore also in error. The Recommendation cited no basis for this

conclusion, nor did it provide any explanation of how providing such a forum could avoid infringing the rights of members who do not wish to subsidize either of the viewpoints expressed—or who wish not to subsidize the expression of any viewpoint at all.

Even assuming, for the sake of argument, that the OSB's publication of non-germane political viewpoints in a "forum" could somehow be germane to the OSB's regulatory purpose, the Recommendation had no basis for concluding that the OSB has actually provided any forum, at all, let alone one that is sufficiently open to overcome any First Amendment problem. Again, there is no record evidence on this point, which illustrates that dismissal under Rule 12(b)(6) before the parties have conducted discovery and developed a factual record is improper.

## CONCLUSION

The Court should decline to follow the Recommendation's conclusions with respect to the dismissal of Plaintiffs' First and Fourteenth Amendment claims and the propriety of OSB's use of member dues to fund the April 2018 *Bar Bulletin* statements and should deny Defendants' motion to dismiss.

Dated: April 15, 2019

<div style="margin-left:40%">

Respectfully submitted,

/s/ Luke D. Miller
Military Disability Lawyer, LLC
1567 Edgewater St. NW
PMB 43
Salem, OR 97304
Telephone: (800) 392-5682
Fax: (503) 779-1091
luke@militarydisabilitylawyer.com

</div>

/s/ Jacob Huebert
Jacob Huebert (*pro hac vice*)
Aditya Dynar (*pro hac vice*)
Goldwater Institute
Scharf-Norton Center for Constitutional Litigation
500 E. Coronado Rd.
Phoenix, AZ 85004
Telephone: (602) 462-5000
Fax: (602) 256-7045
litigation@goldwaterinstitute.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

Document Electronically Filed and Served by ECF this 15th day of April 2019 to:

Sarah Weston
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL,
ELLEN F. ROSENBLUM
Department of Justice
100 SW Market Street
Portland, OR 97201
Sarah.weston@doj.state.org.us
*Attorneys for Amicus Curiae*

Steven M. Wilker
Megan Houlihan
TONKON TORP LLP
888 SW Fifth Avenue, 16th Fl.
Portland, OR  97204
Steven.wilker@tonkon.com
Meg.houlihan@tonklon.com
*Attorneys for Defendants*

W. Michael Gillette
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave., Ste. 1900
Portland, OR 97204
wmgillette@schwabe.com
*Attorneys for Defendants*

/s/ *Jacob Huebert*
Jacob Huebert
**Scharf-Norton Center for Constitutional Litigation
at the GOLDWATER INSTITUTE**