1                IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF OREGON

3                         PORTLAND DIVISION

4
     DIANE L. GRUBER and MARK          )
5    RUNNELS,                          )
                                       )
6                      Plaintiffs,     )   Case No. 3:18-cv-01591-JR
                                       )
7                 v.                   )
                                       )   March 13, 2019
8    OREGON STATE BAR, a public        )
     corporation, CHRISTINE            )
9    CONSTANTINO, President of the     )
     Oregon State Bar, HELEN           )
10   HIERSCHBIEL, Executive Officer    )
     of the Oregon State Bar,          )
11                                     )
                       Defendants.     )   Portland, Oregon
12   _____  )

13

14

15

16                        ORAL ARGUMENT

17                    TRANSCRIPT OF PROCEEDINGS

18             BEFORE THE HONORABLE JOLIE A. RUSSO

19         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

20

21

22

23

24

25

1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF OREGON

3                        PORTLAND DIVISION

4
     DANIEL Z. CROWE, LAWRENCE K.    )
5    PETERSON, and OREGON CIVIL      )
     LIBERTIES ATTORNEYS,            )
6                                    )
                       Plaintiffs,   )  Case No. 3:18-cv-02139-JR
7                                    )
                    v.               )
8                                    )  March 13, 2019
     OREGON STATE BAR, OREGON        )
9    STATE BAR BOARD OF GOVERNORS,   )
     VANESSA A. NORDYKE, CHRISTINE   )
10   CONSTANTINO, HELEN              )
     HIERSCHBIEL, KEITH PALEVSKY,    )
11   and AMBER HOLLISTER,            )
                                     )
12                     Defendants.   )  Portland, Oregon
     _____)
13

14

15

16                        ORAL ARGUMENT

17                  TRANSCRIPT OF PROCEEDINGS

18            BEFORE THE HONORABLE JOLIE A. RUSSO

19        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

20

21

22

23

24

25

```
 1                          APPEARANCES

 2

 3   FOR PLAINTIFF(S) GRUBER and RUNNELS:
                              MICHAEL L. SPENCER
 4                            Attorney at Law
                              403 Main Street
 5                            Klamath Falls, OR 97601

 6   FOR PLAINTIFF(S) CROWE, PETERSON & OCLA
                              JACOB HUEBERT
 7                            Goldwater Institute
                              500 E. Cornoado Rd.
 8                            Phoenix, AZ 85004

 9   FOR PLAINTIFF(S) CROWE, PETERSON & OCLA
                              LUKE D. MILLER
10                            Military Disability Lawyer, LLC
                              1567 Edgewater St. NW
11                            Salem, OR 97304

12   FOR THE DEFENDANT(S):
                              STEVEN M. WILKER
13                            Tonkon Torp LLP
                              1600 888 SW Fifth Avenue
14                            Portland, OR 97204

15   FOR THE DEFENDANT(S):
                              ELISA J. DOZONO
16                            Miller Nash Graham & Dunn LLP
                              111 SW Fifth Avenue
17                            Suite 3400
                              Portland, OR 97204
18
     FOR THE DEFENDANT(S):
19                            MEGAN K. HOULIHAN
                              Tonkon Torp LLP
20                            1600 888 SW Fifth Avenue
                              Portland, OR 97204
21
     FOR THE DEFENDANT(S):
22                            W. MICHAEL GILLETTE
                              Schwabe Williamson & Wyatt
23                            1211 SW 5th Avenue
                              Suite 1600
24                            Portland, OR 97204

25
```

```
 1                          APPEARANCES

 2                          (Continuing)

 3   FOR THE DEFENDANT(S):
                            TAYLOR D. RICHMAN
 4                          Miller Nash Graham & Dunn LLP
                            111 SW Fifth Avenue
 5                          Suite 3400
                            Portland, OR 97204
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                         United States District Courthouse
22                       1000 SW Third Avenue, Room 301
                         Portland, OR 97204
23                       (503)326-8191

24

25                           *   *   *
```

1                    TRANSCRIPT OF PROCEEDINGS

2                        (March 13, 2019)

3    (In open court:)

4              THE COURT:  Good morning.  Thank you, everybody, for

5    your time this morning.  I wanted to let you know that I'm

6    fortunate enough to have a law student and a couple of new

7    lawyers working with me this semester, so they also had an

8    opportunity to read the briefs.  This is such an interesting

9    case.  I really appreciate the educational opportunity, as

10   well, for the new lawyers.

11             DEPUTY COURTROOM CLERK:  Shall I call the case,

12   Your Honor?

13             THE COURT:  I apologize.  Please.

14             DEPUTY COURTROOM CLERK:  We're here on two cases.

15   The first case is Gruber, et al. v. Oregon State Bar.

16   Civil No. 18-1591-JR.  The other case is Crowe, et al. v.

17   Oregon State Bar, et al.  Civil No. 18-2139-JR.

18             THE COURT:  Thank you.

19       First of all, I did read all of the briefing, and, again,

20   I appreciate that.  And I want to say I really did.  I promise.

21   I've read all the briefing.  So if you could please focus your

22   arguments on perhaps points that you think need to be gone over

23   again that I might have missed.  I would really appreciate

24   that.

25       First of all, I will take judicial notice pursuant to FRE

1  201 of the Bar's bylaws and mission statement.  It looks like

2  defendants are conceding that the individual defendants are

3  immune from a suit for damages, so the motion to dismiss based

4  on qualified immunity is denied as moot.  Plaintiffs also

5  concede that the claims against the Board of Governors should

6  be dismissed.  Therefore, those claims are dismissed as well.

7      Regarding defendants' 12(b)(1) motion, asserting that this

8  Court lacks subject matter jurisdiction over the Bar, I would

9  ask the defendants, please, to focus on the Ninth Circuit's

10  *Mitchell v. LA Community College* case.  The five factors -- and

11  it looks like specifically the first factor -- would a money

12  judgment be satisfied out of State funds, it looks like the

13  answer to that question is no.

14      The Ninth Circuit has instructed that that is the most

15  significant factor that this Court should review.  So I would

16  like to hear from you on that.

17      To the plaintiffs, if you could comment on how this Court

18  should distinguish the cases in this district and other

19  districts throughout the Ninth Circuit holding that a state bar

20  is, in fact, entitled to Eleventh Amendment immunity, and I'm

21  looking at cases by Judge Stewart, Judge Acosta, Judge Hogan,

22  Judge Frye, Judge Jelderks.  Several of those cases having been

23  affirmed by the Ninth Circuit.

24      And then if I can move to defendants' 12(b)(6) motion,

25  failure to state a claim against the defendants, that claim

1  seems to focus on the Supreme Court's 1990 opinion in *Keller v.*

2  *State Bar of California*.

3      As you know, plaintiffs, the Ninth Circuit affirmed,

4  *Keller*'s application, as recently as March 2018, in *Caruso v.*

5  *Washington State Bar Association*.   I know you're arguing that

6  the *Janus* -- the Supreme Court's *Janus* decision, on June 27,

7  2018, overruled *Abood* and impliedly overruled *Keller*.

8      I'm having trouble with the argument that *Keller* is

9  overruled.   Again, looking at the significant amount of

10 authority out there, and, for example, I'm looking at a

11 March 8, 2017, decision*, Eugster* - I may be mispronouncing

12 that -- E-u-g-s-t-e-r -- *v. Washington State Bar Association*

13 where the Ninth Circuit held that the district court properly

14 dismissed plaintiff's claims relating to his compulsory

15 membership in the Washington State Bar Association, finding

16 mandatory membership constitutional, and then stating, contrary

17 to plaintiff's contentions, this Court cannot overrule binding

18 authority because, quote, a decision of the Supreme Court will

19 control that corner of the law unless and until the

20 Supreme Court itself overrules or modifies it.

21     So I would appreciate a comment from plaintiffs on that

22 line of authority.

23     And I'm happy to hear from either side first.   Defendants?

24 Thank you.

25          MR. WILKER:  Your Honor, Steven Wilker.  I'm one of

1    the counsel for the defendants.

2        I'll address the Eleventh Amendment issues you raised

3    earlier at the start of your comments.  While the first factor

4    in *Mitchell* is -- is an important factor, it is not a

5    dispositive factor.  There are five factors in the analysis,

6    and the core purpose, as the Supreme Court said of Eleventh

7    Amendment immunity is to afford the State the dignity of its

8    separate sovereignty.  And in this case it is undeniable that

9    the State Bar is an instrumentality of the State of Oregon.

10   It's an entity that performs a regulatory function.

11       It performs an important regulatory function as an arm of

12   the Judicial Department.  And to allow it to be sued in federal

13   court, that doesn't prevent it from being sued in state court.

14   It just prevents it from being sued in federal court because of

15   the strictures of the Eleventh Amendment as they have been

16   applied by the U.S. Supreme Court and by the Ninth Circuit.

17       And that factor is substantially important here, and our

18   considered view is why the Ninth Circuit and the other

19   district -- other districts in this circuit have repeatedly

20   held that state bars are, in fact, immune under the

21   Eleventh Amendment.

22       There was a suggestion in, I believe, one of the briefs

23   filed by the Gruber -- the Gruber plaintiffs, that *Keller* was

24   in federal court.  *Keller* wasn't.  *Keller* came up through the

25   state court system and was on review to the U.S. Supreme Court

1  from the California Supreme Court.   *Keller* does not resolve the

2  issue.

3       Therefore, from our perspective, because you need to

4  afford the State of Oregon the dignity of its separate

5  sovereignty, that factor has to have the most importance in

6  this analysis and is why the Ninth Circuit and other

7  districts -- and other districts in this circuit have

8  repeatedly held that the state bars are, in fact, immune.

9       The other factors can be argued either way.   That the

10 State Bar can hold property doesn't disqualify it from being an

11 arm of the State.   It clearly performs State functions.   It's

12 subject to multiple state laws as if it were a formal agency of

13 the Executive Branch.   It's subject to public records.   It's

14 subject to public meetings.   It is simply not sufficiently

15 separate to justify the Court's departure in holding the State

16 Bar subject to suit in this federal court, and that's why we

17 brought the motion, Your Honor.

18      The Bar dignity as part of the State's sovereignty should

19 be respected, and the claims against the Bar as an entity

20 should be dismissed.

21           THE COURT:   Thank you.

22      Good morning.

23           MR. HUEBERT:   Good morning, Your Honor.

24 Jacob Huebert for the Crowe plaintiffs.

25      It appears to be undisputed here that three of the --

1    three of the factors appear to be undisputed.  There's the fact

2    that the judgment would not be payable out of the

3    State Treasury.  There's the fact that the State Bar is an

4    entity that can sue and be sued, and there's the fact that the

5    State Bar is an entity that can hold property in its own name.

6        So that just leaves two factors that are really in dispute

7    here.  One of which is the one that the defendants are

8    emphasizing.  The question of whether the State Bar performs a

9    centralized government function.  And in the briefs, the State

10   Bar has focused on the fact that it -- it does perform a

11   central role inasmuch as it -- it deals with attorneys

12   throughout the state, not just in a particular locality.  But a

13   state bar doesn't exactly perform a governmental function at

14   all as the Supreme Court recognized in *Keller*.

15       In *Keller*, the U.S. Supreme Court said for federal

16   constitutional purposes a state bar association, a mandatory

17   bar association, is more like a public sector union than it is

18   like an ordinary state agency.

19       It said it performs more of an advisory role than an

20   actual governmental role.  It said that the State Bar is

21   created not to participate in the general government of the

22   state but to provide specialized professional advice to those

23   with the ultimate responsibility of governing.  That was true

24   with the State Bar of California in *Keller*, and it's true with

25   the Oregon State Bar here.

1      The Supreme Court has ultimate authority for admitting

2   lawyers, disciplining lawyers, and exercising governmental

3   power with respect to lawyers.  The State Bar performs an

4   advisory role in telling the Court who it thinks should be

5   admitted, who it thinks should be disciplined; but, ultimately,

6   the governmental function is performed by the Supreme Court

7   itself.

8      And the State Bar also acts independently of the state --

9   of the central state government.  It's governed by its Board of

10  Governors, and it's not controlled by the state supreme court

11  or any other part of the state government.

12     So this factor doesn't weigh in favor of immunity, it

13  weighs against immunity, and that leaves just one more disputed

14  factor which is the entity's corporate status.  Here, again,

15  its status is not one of an ordinary governmental agency.  It's

16  status is one of a special sort of government entity, many of

17  which, such as school districts, are certainly not protected by

18  the Eleventh Amendment immunity.  And, again, Keller's

19  observation is highly relevant here because the Court in *Keller*

20  recognized that when it comes -- however the State describes

21  this entity, for federal constitutional purposes, it doesn't

22  act like a state agency.  When it's -- particularly when it's

23  engaging in political advocacy, it's engaging in private speech

24  and shouldn't be treated like a state agency for purposes of

25  federal constitutional rights.

1               THE COURT:  Thank you very much.

2          Mr. Wilker?

3               MR. WILKER:  Thank you, Your Honor.  Let me be clear.

4     The fact that the State might not have to pay a judgment

5     against the Bar doesn't mean that the State's Treasury funds or

6     the State Treasury isn't enacted.  The State has delegated to

7     the Bar administrative functions related to the admission and

8     discipline of attorneys in the state of Oregon.  Those

9     functions, if the Bar is forced to pay damages, will then

10    reduce the funds available to perform those functions which

11    will then be a draw in the State budget to achieve that same

12    result.

13         As for -- excuse me, as for the last point that counsel

14    made, the -- the attack here on the Bar is not simply about

15    particular speech-related activities.  The attack here is

16    broader.  It's on whether or not these plaintiffs can be forced

17    to join a mandatory integrated bar that provides both

18    discipline admission functions at the direction and delegation

19    of the State Judicial Department and does other things, right,

20    that's -- because that's what makes it integrated.  And that

21    broad side attack challenges not merely these associational

22    activities.  It attacks the right to be -- to be -- the right

23    of the State to compel membership in this integrated bar.  And

24    because of that, it directly impacts a governmental function

25    that the Bar serves, which is the administration of the

1    disciplinary system and the administration of the admission

2    system, and it does so under a delegation of authority from the

3    Judicial Department.

4         That the Judicial -- that the Supreme Court ultimately may

5    review disciplinary cases doesn't change the fact that the Bar

6    performs an integral function in both creating a record and, in

7    many cases, in implementing a sanction against a lawyer for

8    violating its provisions.  Only certain kinds of cases are

9    subject to automatic review at the Supreme Court in terms of

10   that.  And so if the -- if no review is sought, the discipline

11   imposed by the Bar is the discipline of the State of Oregon's

12   Judicial Department on that lawyer.

13             THE COURT:  Okay.  Thank you.

14             MR. SPENCER:  Your Honor, one question the Court had

15   was the impact of the other cases that did not discuss

16   *Mitchell*, and that wasn't discussed, and I would like to bring

17   that up.

18        In reviewing those cases, they relied entirely on either

19   the *Hirsh* case, at 67 F.3d 708, or the *Paulson* case.  I don't

20   have that right here in front of me.  But, anyway, another

21   Ninth Circuit case.  If you look at those cases, they relied

22   upon cases predating *Mitchell*.  And at no point did any of the

23   district court cases in Oregon or these Ninth Circuit court

24   cases discuss *Mitchell* whatsoever.  They just relied on older

25   cases and said, well, obviously, this -- there was no

1   evaluation of whether or not the Bar was an arm of the State.

2   They just said it is.

3        So the question you have is is *Mitchell* the law in the

4   Ninth Circuit, if properly raised, or do we just say it is?  We

5   believe *Mitchell* is the law.  If you do the *Mitchell* analysis,

6   as we said, then the Court sees where that goes.

7        So that's why we distinguished these as that they -- this

8   issue apparently wasn't raised because it was not discussed in

9   those cases, even at the Ninth Circuit, post-*Mitchell*.  Is

10  *Mitchell* still good law?  Is that how we decide it?  Has that

11  ever been decided with, you know, any state bar anywhere in the

12  Ninth Circuit?  The answer is no.  *Mitchell* has never been used

13  in that fashion.  Why?  We don't know.

14       It's one of those things we have where the higher court

15  sets out a rule and then ignores it, perhaps, later on.  We

16  have to deal with that as lawyers.  But we believe *Mitchell* is

17  the proper means of complying with the United States Supreme

18  Court's requirement that a determination be made whether the

19  entity is an arm of the state, the Ninth Circuit has come up

20  with a great test.  That is the only test, and we should use

21  that test -- the *Mitchell* test.

22            MR. HUEBERT:  May I add something, Your Honor, in

23  response to the points that were made?

24            THE COURT:  Certainly.

25            MR. HUEBERT:  Regarding the idea that the judgment

1    against the Oregon State Bar could affect the State Treasury,

2    the question is whether a judgment against the State Bar would

3    be paid out of the State Treasury.  And the only judgment for

4    monetary judgment -- the damages that we would have against the

5    State Bar in this case would be to recover the dues that these

6    individual plaintiffs have paid.  That's the only monetary

7    impact on anybody here, and that would certainly not come out

8    of the State Treasury.

9         As for the suggestion that granting us declaratory

10   injunctive relief would affect the State Treasury, as an

11   initial matter, again, that is not relevant to what the

12   *Mitchell* test is looking at; and, secondly, if we were to

13   prevail here and the mandatory bar association were to be

14   declared unconstitutional, then, of course, the State would

15   have to adopt a new regulatory scheme, and that scheme could

16   still charge lawyers for the cost of regulating them, which is

17   what state supreme courts do in other states where you don't

18   have a mandatory bar association.

19        So even there, there's no reason to think that the State

20   Treasury is going to be affected by the outcome of this

21   litigation.

22             THE COURT:  Okay.  Thank you.

23             MS. DOZONO:  Your Honor, if I may respond to some of

24   Mr. Spencer's points in regards to how courts in Oregon and the

25   Ninth Circuit have reviewed these bar cases since *Mitchell*.  On

1    page 4 of our reply brief, we cited to you one, two, three,

2    four -- four District of Oregon cases all decided

3    post-*Mitchell*, as well as *Eardley*, a Ninth Circuit case that

4    was decided post-*Mitchell*, holding that the Oregon State Bar

5    was -- is immune under the Eleventh Amendment.

6          So this is difficult for us to understand how there is an

7    argument that the Ninth Circuit itself, in reviewing the

8    Eleventh Amendment immunity post-*Mitchell*, would not have

9    considered those factors even though they may not be detailed

10   within the opinion.

11         In addition to the point that Mr. Huebert just made,

12   the -- you know, the Oregon Supreme Court has decidedly

13   addressed the issue of, you know, how corporate status affects

14   whether or not the Bar is an arm of the State.  That a state

15   bar is subject to numerous laws of the state, regulating state

16   agencies, it performs functions on behalf of the judicial

17   department.  It is subject to the public records law.  It is

18   subject to the Tort Claims Act.  It has all these

19   responsibilities of the state government.

20         And that is what the Ninth Circuit in *Alaska Cargo* focused

21   on, in terms of the first and the second factors, that you

22   cannot divorce the first and second *Mitchell* factors in

23   deciding whether or not an agency is an arm of the state.  It's

24   not just whether a money judgment is paid.  You have to look at

25   the totality of the circumstances as to whether or not you are

1   truly performing a vital government function, and the Oregon

2   State Bar in this case is.

3            THE COURT:  Okay.  Anything further?

4       Can we move on to the 12(b)(6)?

5            MR. HUEBERT:  One very short point on that, and

6   that's simply that the defendants here haven't shown that these

7   facts about the Oregon State Bar distinguish it from the State

8   Bar of California, which perform highly similar roles, and,

9   again, was treated in the Supreme Court as not an ordinary

10  governmental agency.

11      And as for the Ninth Circuit authorities and the district

12  court authorities, all of those are either unpublished or

13  district court opinions, and therefore none of them is binding

14  on this Court, and so the Court's responsibility is to follow

15  the Ninth Circuit's instructions to apply the factors.

16      Thank you.

17           THE COURT:  Thank you.  Defendants, on your 12(b)(6)

18  failure to state a claim argument, please.

19           MS. DOZONO:  Your Honor, since I -- I -- since you

20  have read all the briefs, I will keep these comments fairly

21  short.  We believe that this is a fairly straightforward motion

22  because this Court is bound by Supreme Court and Ninth Circuit

23  precedent to deny plaintiffs' three claims for relief.  Their

24  claims, in essence, are that the State should -- that lawyers

25  should not be forced to pay mandatory dues, that they cannot be

1   compelled to pay for political speech without adequate

2   safeguards, and they cannot be compelled to pay for political

3   speech without affirmative consent.  The Supreme Court has

4   definitively ruled on the first issue in 1961, in *Lathrop*,

5   which has been repeatedly affirmed that lawyers can be

6   compelled to join and pay for being members of the State Bar,

7   as noted in *Keller* in 1990 and in *Harris* in 2014.

8       The *Janus* case, on which plaintiffs attempt to hang their

9   hat, does not overrule *Keller*, *Harris*, or *Lathrop*, and unless

10  and until the Supreme Court overrules *Keller*, it remains the

11  governing law, and the Court is bound to follow that.

12      In summary, the Constitution does permit compulsory bar

13  membership and mandatory membership fees.  A bar may engage in

14  political speech so long as it's germane to the regulation of

15  attorneys or improving the quality of legal services and

16  affords adequate First Amendment safeguards by offering

17  reasonable and prompt opportunity for a hearing before a

18  neutral decision-maker on claims based on allegedly non-germane

19  speech.

20          THE COURT:  Thank you very much.

21          MR. HUEBERT:  Your Honor, *Keller* doesn't control

22  plaintiffs' claim challenging mandatory bar membership for

23  several reasons.  One reason why *Keller* doesn't require the

24  Court to dismiss plaintiffs' claim out of hand is because -- we

25  know that based on actions the Supreme Court has taken in a

1   case called *Fleck v. Wetch*.  In *Fleck* in 2017, the Eighth

2   Circuit rejected a challenge of mandatory bar membership and

3   fees, citing *Keller*.  And then after *Janus*, the Supreme Court

4   vacated that decision and ordered the Eighth Circuit to

5   reconsider in light of *Janus*.

6       So if defendants were correct that because *Janus* didn't

7   specifically overrule *Keller* and nothing has changed, then

8   there would have been no reason for the Supreme Court to do

9   that.  The Supreme Court knows it didn't specifically overrule

10  *Keller* in *Janus*, and, yet, it thought there was something for

11  the Eighth Circuit to do.  Presumably, it wasn't going through

12  the exercise to make them perform a totally useless act.  So

13  that's one reason to think that *Keller* doesn't control here.

14      And in *Janus*, the Supreme Court said that mandatory union

15  fees are subject to exacting First Amendment scrutiny, and in

16  doing so, it overruled the *Abood* case, which hadn't applied

17  exacting First Amendment scrutiny to mandatory public sector

18  union fees.

19      Now, *Keller* approved of mandatory bar dues by reasoning

20  that a mandatory bar association should be subject to the same

21  rule that applies to a compulsory public sector union.  So

22  because *Abood* said it was okay to make public workers pay fees

23  to a union to cover the costs of collective bargaining, it

24  must, therefore, also be acceptable to require attorneys to pay

25  a bar association to cover the cost of regulating attorneys.

1      Now, of course, with *Abood* overruled, mandatory union fees
2  are subject to exacting First Amendment scrutiny and have been
3  struck down under that standard.  And so if we're going to do
4  what *Keller* says, which is to treat a mandatory bar association
5  like a compulsory public sector union, then we should subject
6  the compulsory membership and compulsory fees of a bar
7  association to the same exacting scrutiny that applies to
8  public sector union fees.
9      And the defendants haven't argued at this stage of the
10  proceedings it could survive exacting First Amendment scrutiny,
11  and that means the plaintiffs have stated a valid claim that
12  should proceed.
13      Another reason why *Keller* doesn't control the membership
14  claim is because *Keller* explicitly declined to address a
15  broader freedom of association claim that would have argued
16  that plaintiffs have a right not to associate with a bar
17  association that engages in non-germane political speech at
18  all.
19      The Supreme Court explicitly declined to do that, said
20  that lower courts could address that issue in the first
21  instance, and so that means that this Court can address that
22  issue in the first instance in ruling on plaintiffs' third
23  cause of action.  So for those reasons, the Court should not
24  dismiss plaintiffs' third cause of action.
25      Plaintiffs' second cause of action argues that attorneys

1    shouldn't be forced -- or can't be forced to pay for any bar

2    association, political or ideological speech, without their

3    affirmative consent.  This is based on *Janus* as well, where the

4    Supreme Court said that government workers couldn't be forced

5    to pay for a public sector union's political speech without

6    their clear prior affirmative consent, and it recognized that

7    bar -- or, excuse me, union fees would inevitably be used for

8    political speech.  And so the only way to protect workers'

9    First Amendment rights was to not take money from them at all

10   without their affirmative consent in advance.

11       And the same is true here.  There's no dispute that the

12   Oregon State Bar uses member dues for various kinds of

13   political speech.  And so the only way to protect members'

14   First Amendment rights is to say you can't take any money that

15   will be used for political speech without a member's clear

16   prior affirmative consent.

17       There's no justification for making them pay fees to this

18   organization when the State could serve its interest -- its

19   compelling interest in approving the quality of legal services

20   by simply regulating attorneys directly without forcing them to

21   join or pay money to a bar association that engages in

22   political speech.

23       Regarding plaintiffs' first claim for relief, this claim

24   is an alternative claim that assumes that *Janus* didn't change

25   anything and that the law is the same as it was before *Janus*

1    and *Keller* applies the same as ever.   *Keller* said that bar

2    associations have to provide certain protections to ensure that

3    attorneys' mandatory dues are not used for political and

4    ideological speech and other activities that are not germane to

5    improving the quality of legal services, and the Court said

6    that procedures that would satisfy the constitutional

7    requirement are those that the Court prescribed for public

8    sector unions in *Hudson v. Chicago Teachers Association*, and

9    those factors are, one, providing an adequate explanation for

10   the fee that's charged; two, providing an opportunity -- a

11   reasonably prompt opportunity to challenge the fee; and, three,

12   putting any funds that are disputed into escrow while a dispute

13   is pending.

14        Here the Oregon State Bar, at a minimum, doesn't satisfy

15   the first and third of those requirements.  It doesn't provide

16   an adequate explanation for its fee.  It doesn't explain

17   whether or how it determines whether its expenditures are

18   germane to the purpose of improving the quality of legal

19   services.  It apparently proceeds on the assumption that

20   everything that it does is germane and then leaves it to

21   lawyers to figure out whether that's true and challenge

22   anything the lawyer believes is not germane.  That is not

23   enough when they're not providing the information up front on

24   whether and how this determination was made.

25        And we know in 2018 that the State Bar did use funds for

1  political speech that wasn't germane in publishing these two

2  Bar Bulletins that the plaintiffs objected to; but,

3  nonetheless, in 2019, the State Bar has gone on and -- to

4  assume once again that everything it will do is germane.

5      Under *Hudson* and *Keller*, that is not what it's supposed to

6  do.  It's not enough to protect attorneys' First Amendment

7  rights.

8      With respect to the third factor, there's no dispute that

9  the Oregon State Bar does not put money in escrow when there is

10 a dispute, as *Hudson* and *Keller* require, and that requirement

11 is important because it ensures that an attorney's money will

12 not be used for any length of time in any amount to subsidize

13 political and ideological speech and other non-germane

14 activities that the attorney has a First Amendment right not to

15 pay for.

16     So for those reasons, even -- regardless of how the Court

17 rules on the second and third claims for relief, it should deny

18 the motion to dismiss with respect to the first claim for

19 relief.

20         THE COURT:  Thank you.

21         MS. DOZONO:  Your Honor, on the exacting scrutiny

22 point, in our brief, we review the *Harris* case, and the *Harris*

23 case does say that compulsory bar dues still do meet the

24 exacting scrutiny standard, and they applied exacting scrutiny

25 in that case.  They said that Bar members could not be required

1    to pay for dues for political or ideological purposes but could

2    be required to pay for activities connected with proposing

3    ethical codes and disciplining bar members and that the rules

4    serve the State's interest in regulating the legal profession

5    and approving the quality of legal services.

6        They recognize that states have a strong interest in

7    allocating to lawyers, as well, the costs of policing their own

8    ethical practices and opposed to that of lawyers.

9        So on the exacting scrutiny point, *Harris* still says that

10   *Keller* still controls.

11       And the reason that *Keller* still controls is, I think,

12   highlighted by some of plaintiffs' arguments trying to so

13   closely align the bar membership with union membership.  Bar

14   members are not union members.  They are a different group of

15   people who are officers of the court and required to uphold the

16   justice system.

17       So in terms of the speech without affirmative consent,

18   you're talking about political speech.  And in the Ninth

19   Circuit cases of *Morrow* and *Gardner*, both of which are motion

20   to dismiss cases -- the *Gardner* Ninth Circuit court noted that

21   undoubtedly every effort to persuade public opinion is

22   political in the broad sense of that term; however, what *Keller*

23   found objectionable was not political activity but partisan

24   political activity, as well as ideological campaigns, unrelated

25   to the Bar's purpose.

1    Here, the speech that the Bar engages in seeks to be

2    *Keller*-pure, and that is the reason you don't have a segregated

3    set of funds as you have would in a union where you may have

4    germane versus non-germane speech.  All of the Bar's

5    expenditures are focused on germane speech.

6    To the extent that somebody believes that that speech is

7    not germane, there are -- there are procedures in place in the

8    Bar bylaws that allow a member to seek prompt review of any

9    allegations that the speech that the funds were used for was

10   not germane.

11   Plaintiffs used those procedures in this case.

12   And so the *Hudson* factors that the plaintiffs reviewed, as

13   well, require the adequate explanation of the funds and the

14   opportunity to challenge and the escrow.  And, again, the

15   escrow analogy here makes no sense because, again, you are

16   not -- you're not distinguishing between chargeable versus

17   nonchargeable fees as you are in these agency shop cases where

18   you have some union members and some nonunion members who are

19   choosing to either fund or not fund a union membership and what

20   speech the union wishes to engage in as a whole.

21   So you don't -- it is completely different than the union

22   cases.  The statements that plaintiffs raise, the Ninth Circuit

23   cases in both *Morrow* and *Gardner* both dealt with campaigns that

24   dealt with the image of lawyers to the general public, and the

25   *Gardner* case said it is no infringement of a lawyer's First

1   Amendment freedoms to be forced to contribute to the

2   advancement of the public understanding the law.

3        And in this case, the statements that plaintiffs have

4   complained about does just that.  The statement by the Oregon

5   State Bar stood up against white supremacy and the

6   normalization of violence and speech that incites violence.

7   And both of those statements are germane to the ability of

8   citizens to have faith in their government, in the lawyers that

9   they -- in the lawyers and the judges and the justice system to

10  uphold the law equally to all people.

11            MR. WILKER:  I just wanted to add briefly.  I concur

12  with everything that Ms. Dozono said, but the comment about the

13  impact of what is the summary reversal and remand to the Eighth

14  Circuit in *Fleck* means, it means nothing with respect to this

15  case because the Court didn't overrule *Keller*.

16       What it said to the Eighth Circuit is, "You relied on

17  *Abood*.  We just overruled *Abood*.  You need to reanalyze your

18  case without *Abood*."  Presumably, that is what the Eighth

19  Circuit will do.  Presumably, if the plaintiffs there don't

20  like the result, they will take it up.

21       I'll also suggest to the Court, for the reasons Ms. Dozono

22  just explained, the difference between having an opt-out or

23  non-germane speech and trying to -- and what the Oregon

24  approach is distinguishes this case from *Fleck* itself.

25       Oregon aims its bylaws provide for the germane purposes

1    for which the Bar may act when they speak.  If it makes a --

2    what the plaintiffs claim is a mistake in that function, it

3    provides a remedy and a swift remedy to seek a refund of those

4    portions of their -- of the Bar fees that may have been used

5    for things that are non-germane, and plaintiffs had that

6    available to them and chose not to -- and chose not to pursue

7    it.  That doesn't mean it's not available and that doesn't

8    create a constitutional claim simply because they have refused

9    to use the procedure that's available and that meets the

10   requirements of *Keller*.

11       Had the Bar, like other bars, decided that some portion of

12   its bar dues would be used for political speech that was

13   outside the bounds of *Keller*, it would create some fund to do

14   that.

15       The *Chicago Teachers* case is different.  The *Chicago*

16   *Teachers* case involves an advance -- an interim fee and an

17   advance use of the funds and, therefore, the procedure needed

18   to be in place in the front end.  Here, the Bar doesn't intend

19   to do anything and speak in any fashion that's not germane.

20   And as a result of that, there's no point.  The Bar would

21   simply say, "A hundred percent of our fees are for germane

22   activities and here's our budget," and then if a plaintiff

23   disagrees with that, they can challenge it.

24       But these plaintiffs haven't done that.  They've simply

25   filed this lawsuit rather than avail themselves of the

1   available remedy within the State Bar's bylaws to seek a refund

2   of that portion of their fees.

3       As for the escrow, it makes no sense if you're not

4   reserving any funds in advance for these kinds of activities.

5   And when plaintiffs -- had plaintiffs, in fact, sought a refund

6   and obtained one, they got interest on their money from the

7   date it was determined.  This is simply a meaningless argument

8   that doesn't advance the case here where we're talking about an

9   organization that strives to do only that which *Keller* permits

10  it to do.

11      And for that reason and for the reasons we've already

12  articulated, the Supreme Court's holding in *Keller* is

13  controlling.  It hasn't been reversed.  It hasn't been reversed

14  in silence by the Court.  It hasn't been reversed in *Fleck*.  It

15  was certainly referred to and reaffirmed to the extent in

16  *Harris* where the Court said it fits comfortably within the

17  framework it was adopting.  And for those reasons the

18  plaintiffs' claims need to be dismissed.

19          MS. DOZONO:  If I may gently correct one point of my

20  esteemed co-counsel?  The plaintiffs in the Crowe case did --

21  in their complaint, they do note that they contacted the Oregon

22  State Bar to inform them of their objections.  They did request

23  a refund, as the -- as the bylaws require, and they also

24  received refunds from the Oregon State Bar.

25          MR. WILKER:  I wasn't suggesting otherwise.  They

1   didn't avail themselves of the arbitration procedure provided

2   in the bylaws to challenge that.

3            THE COURT:  Okay.  Thank you very much.

4        Any response, sir?

5            MR. HUEBERT:  Yes, Your Honor.  First, *Harris v.*

6   *Quinn* does not say that mandatory bar membership or fees can

7   survive exacting First Amendment scrutiny.  It doesn't address

8   that question at all.  *Harris v. Quinn* does recognize that the

9   State has a compelling interest in regulating the legal

10  profession, and it says it has an interest -- a strong interest

11  in requiring lawyers to pay for the cost of that regulation,

12  but it doesn't address the other part of exacting scrutiny,

13  which is whether there is another -- there is a way that a

14  state could serve those compelling interests that wouldn't --

15  that would infringe significantly less on First Amendment

16  rights.  *Harris* simply doesn't get into that question at all,

17  and, therefore, it says nothing about whether mandatory bar

18  membership or fees would survive exacting First Amendment

19  scrutiny.

20       Regarding the claim that bar members are not union

21  members, well, they're not; but *Keller* said it's appropriate to

22  treat them as the same, and that part of *Keller* hasn't been

23  called into question by anything.

24       The defendants argue that they -- they strive to comply

25  with *Keller*.  They are not trying to engage in any

1    inappropriate political speech.  They say they do provide

2    appropriate procedures, but those are all factual questions.

3    Those rely on things that are not in the complaint in this case

4    and aren't resolved simply by taking judicial notice of the

5    Bar's bylaws.

6        The question of what kind of speech they engage in and how

7    their procedures actually work is something that is appropriate

8    to explore in discovery and resolve either through a motion for

9    summary judgment or a trial.  It's not an issue that is

10   appropriate for disposing on a 12(b)(6) motion.

11           THE COURT:  Thank you.

12           MR. SPENCER:  Your Honor, I would like to talk a

13   little bit about the Court's question that somewhat touched on

14   this.  We do have *Keller* out there.  And then, obviously*, Abood*

15   didn't go and look at every case it relied on and said we're

16   overturning that.

17       The question is did the *Fleck* case effectively overturn

18   *Keller*?  And I think in this situation -- and *Fleck* is

19   important because it is as close to this case as we have.  This

20   is a case where the North Dakota Bar -- you had to -- you have

21   to be a member of the North Dakota Bar in order to practice

22   law.

23       Now, North Dakota did provide a means you can opt out of

24   that, at least to some extent, and there is some challenge

25   about that and whether you -- you have to do an opt-out or an

1   opt-in.  Oregon is even worse.  We don't have an "opt-out in

2   advance" process.  They don't even give us an opportunity in

3   the state of Oregon to do that.  So at least that part of it is

4   there.

5       Counsel said, well, what the Supreme Court said in *Fleck*

6   was, well, *Abood*'s no good.  Eighth Circuit, go back and review

7   this.

8       The Eighth Circuit did not rely on *Abood* in making its

9   decision originally.  If you look at our reply brief on page 2,

10  we quote the part -- and it's a very small paragraph where they

11  talk about it.  They affirm the district court based on its

12  ruling on *Keller* only, not on *Abood*.  It had absolutely nothing

13  to do with *Abood*.  If you look at either the district court

14  case or the Eighth Circuit case, you won't find a reference to

15  *Abood*.  You find a reference to *Keller* and only *Keller*.

16      So when the Supreme Court takes this case on, they have

17  three options, basically.  The first option, they could have

18  denied cert.  What would that have meant?  That meant *Keller*

19  certainly applied.  They didn't do that.  They could have

20  accepted cert, had briefing, written an opinion, and then sent

21  it back to the Eighth Circuit for a decision in conformance to

22  whatever it decides, and then they could have specifically

23  said, yes, you know*, Keller* is overturned; or they could have

24  taken their third option and said, no, we're not even going to

25  waste our time having oral argument and briefing*.   Keller*

doesn't apply anymore.  *Janus* does.  Eighth Circuit, review
this.  Deal with your opinion based on what *Janus* says.

What is *Janus*?  *Janus* is not a labor law case.  Defendants
keep talking about unions and stuff.  *Janus* is a
First Amendment case.  And the most important statement in
*Janus* is where the Supreme Court said in First Amendment cases
we will no longer allow a rational basis analysis.  You have to
use exacting strict scrutiny, or maybe, if you happen to be
commercial speech, highest scrutiny.

And I agree with co-counsel here that *Harris* never
conducted any analysis under any scrutiny.  First off, all of
the discussions about *Keller* are dicta.  They were responding
to concerns, but they weren't -- this was not a review of a
state bar case.

What happened in *Harris* is they told -- in that case the
State of Illinois -- that you don't have sufficient
justification to regulate these part-time employees at all.
You can't make them be a member, not because of speech issues,
but you can't even get there because you haven't met the first
part of it -- of a compelling state interest.

So they said, yes, but that doesn't change what we said in
*Keller*.  Yes.  State's have a compelling state interest to
regulate attorneys.  We don't disagree with that.  But that's a
two-part test.  Once you get to that, then you have to look at
how they do it.  Have they complied with the scrutiny level

required by the court?  And if you look at *Keller*, or even
before that, *Lathrop*, those were all rational basis tests.
*Keller* did not change *Lathrop* as to even the other speech, the
non-germane speech -- or the germane speech.  That was a
rational basis test.

    *Janus* just says, no, it doesn't work that way.  This is
speech.  All speech is protected.  It doesn't matter whether
it's germane or non-germane.  All speech is protected.  You
can't regulate speech.  You can't make people pay for someone
else's speech, nor can you tell people they can't speak.  It's
looked at the same way.  *Janus* is a First Amendment case, not a
labor law case, and it needs to be reviewed that way.

    *Fleck* effectively overturned *Keller*.  It can have no other
interpretation than to do that.  Otherwise, they would have
denied cert entirely if *Keller* applied in the Supreme Court's
opinion.  Or if they weren't certain, they would have had
briefing.

    Three options, deny cert, and that affirms *Keller*, and
there's no question.  We go up and we try to convince them to
change their mind.  They can argue it and we'll see what their
decision was or what they did.  They made a decision.  They
said *Keller* isn't what you look at this at.  Look at it under
*Janus*.  There is no other way to read *Fleck* than to say that
overturned *Keller* without them coming out and saying it.
There's no other way that has to go because there's no reason

1   to look at *Janus* if *Keller* is good law.   There's absolutely no

2   reason why the Eighth Circuit should even think about *Janus* if

3   *Keller* is still good law.

4        Thank you.

5            MR. HUEBERT:   I would like to clarify a point on

6   which we may differ from the plaintiffs in the other case on

7   these issues, if I may.

8            THE COURT:   Remind me, Mr. Huebert, which case are

9   you?

10           MR. HUEBERT:   I'm counsel for the Crowe plaintiffs.

11           THE COURT:   Crowe.

12           MR. HUEBERT:   It's not the Crowe plaintiff's position

13   that *Fleck* overruled *Keller*.   It's the Crowe plaintiff's

14   position that *Fleck* simply indicates that the Supreme Court

15   considers it appropriate for lower courts to consider, in the

16   first instance, whether mandatory bar membership and mandatory

17   bar fees used for political speech are constitutional in light

18   of *Janus*.   And that just means that *Keller* doesn't necessarily

19   require a dismissal of the case out of hand, but I wouldn't say

20   that *Fleck* overturned *Keller* because the type of order the

21   Court issued simply couldn't do that.

22        That's all.

23           MS. DOZONO:   On the *Harris* case and the issue of

24   exacting scrutiny, *Harris* was an exacting scrutiny case.   The

25   language in Section B of the -- of the *Harris* decision says

1   this decision fits -- this decision fits comfortably within the

2   framework applied in the present case.   Exacting scrutiny.

3   It's a -- our decision in this case is wholly consistent with

4   our holding in *Keller*.

5       So the Supreme Court in *Harris* is applying exacting

6   scrutiny to the issue of mandatory dues and saying that the

7   *Keller* case still meets the exacting scrutiny standard.

8       In terms of whether or not this is appropriate for a

9   motion to dismiss, in their complaint the plaintiffs merely

10  have these bare assertions that -- that the procedures are

11  inadequate, and that is simply insufficient under *Iqbal* and

12  *Twombly*.

13      The *Eugster* case -- the district court case out of the

14  District of Washington, in *Eugster*, said that bare assertions

15  that activities are nonchargeable is legally conclusory and

16  insufficient.   You have to plead facts that give rise to a

17  reasonable inference that unreimbursed activities paid for are

18  unrelated to regulating the legal profession and improving the

19  quality of legal services.

20      And plaintiffs in the Crowe case have made no assertion

21  that statements that condemn white supremacy and normalization

22  of violence do not have to do with regulating the legal

23  profession and improving the quality of legal services.

24      When you have cases in the Ninth Circuit that were decided

25  on a motion to dismiss, it had to do with public relations and

1  public image campaigns as to whether lawyers can be relied on

2  by the general public to uphold the rule of law and for all

3  citizens to believe that they get a fair shake when they come

4  to the Court for resolution of their grievances, that is --

5  that is, under *Keller*, improving the quality of legal services

6  available to the people of the state.

7          MR. WILKER:  Your Honor, I just wanted to make one

8  last point.  It's actually a procedural point.  I wanted to

9  bring it to the Court's attention.  When plaintiffs in the

10 Gruber case filed their first amended complaint, we've -- and

11 added parties, we then refiled our motion to dismiss.  They did

12 not refile any of their opposition papers.  They did not refile

13 their summary judgment papers.  As a technical matter, our

14 motion is effectively unopposed.

15     More to the point, their motion no longer -- their motion

16 for summary judgment no longer exists because it's been

17 superseded by a subsequent pleading.  And the authority for

18 that, Your Honor, in the Ninth Circuit, include *Rhodes v.*

19 *Robinson*, 621 F.3d 1002, at 1005 -- it's a 2010 case -- as well

20 as *Ramirez v. City of San Bernardino*, 806 F.3d 1002 and at

21 1008, which is a 2015 Ninth Circuit case.

22     Because the new pleading superseded the prior pleading, as

23 a technical matter, the plaintiffs, if they wish to re-present

24 their positions, they needed to actually file -- refile their

25 motion and refile their opposition.  They haven't done so.  I

1    just bring that to the Court's attention because it is a

2    technical defect in the pleadings as they stand now.

3                    THE COURT:  Thank you.

4        Sir?

5                    MR. SPENCER:  Obviously, this is the first time this

6    has been raised, so I haven't had an opportunity to research

7    our case, and I'm not in a position to argue that one way or

8    the other.  If we have to refile, we will refile it.  However,

9    I do want to make one final comment, and it goes to quote to

10   *Harris*.  The quote properly speaks -- says this decision fits

11   comfortably within the framework applied in the present case.

12   And it's talking about *Keller*.  It doesn't say it comfortably

13   fits within exacting scrutiny.

14       Again, we get back to what was the decision based on in

15   *Harris*?  It never did an analysis under any scrutiny.  It

16   relied on the first part of the test, and that's what our point

17   is.  We're not trying to put words into the decision.  Look at

18   the exact words in there rather than putting in parentheses

19   exacting scrutiny instead of something else.  I think that's

20   very important in reviewing *Harris*.

21       Thank you.

22                    THE COURT:  Thank you very much.  Again, I appreciate

23   everybody's briefing and thoughtful and helpful comments today

24   and argument today.  These cases are designated related, and I

25   guess that is sufficient.  The other option would be to

1   consolidate the cases.  I don't care, frankly.

2       Do plaintiffs have an opinion about that?

3           MR. HUEBERT:  Related is good for us.

4           MR. SPENCER:  For us, as well.

5           THE COURT:  I'll maintain the related status, then.

6   Thank you.  I appreciate your time.

7           DEPUTY COURTROOM CLERK:  Court is adjourned.

8                   (Hearing concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        Diane L. Gruber, et al. v. Oregon State Bar, et al.

4                        3:18-cv-01591-JR

5                             and

6

7        Daniel Z. Crowe, et al. v. Oregon State Bar, et al.

8                        3:18-cv-02139-JR

9

10                       ORAL ARGUMENT

11                      March 13, 2019

12

13        I certify, by signing below, that the foregoing is a

14   true and correct transcript of the record, taken by

15   stenographic means, of the proceedings in the above-entitled

16   cause.  A transcript without an original signature, conformed

17   signature, or digitally signed signature is not certified.

18

19   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
20
     Official Court Reporter     Signature Date: 6/18/19
21   Oregon CSR No. 98-0346       CSR Expiration Date:  9/30/20

22

23

24

25