**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL Z. CROWE; LAWRENCE K. PETERSON I; OREGON CIVIL LIBERTIES ATTORNEYS, an Oregon nonprofit corporation,<br>     *Plaintiffs-Appellants*,<br><br>v.<br><br>OREGON STATE BAR, a Public Corporation; OREGON STATE BAR BOARD OF GOVERNORS; VANESSA A. NORDYKE, President of the Oregon State Bar Board of Governors; CHRISTINE CONSTANTINO, President-elect of the Oregon State Bar Board of Governors; HELEN MARIE HIERSCHBIEL, Chief Executive Officer of the Oregon State Bar; KEITH PALEVSKY, Director of Finance and Operations of the Oregon State Bar; AMBER HOLLISTER, General Counsel for the Oregon State Bar,<br>     *Defendants-Appellees*. | No. 19-35463<br><br>D.C. No. 3:18-cv-02139-JR |

| | |
|---|---|
| DIANE L. GRUBER; MARK RUNNELS, *Plaintiffs-Appellants*, | No. 19-35470 |
| v. | D.C. No. 3:18-cv-01591-JR |
| OREGON STATE BAR; CHRISTINE CONSTANTINO; HELEN MARIE HIERSCHBIEL, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted May 12, 2020
Portland, Oregon

Filed February 26, 2021

Before:  Jay S. Bybee and Lawrence VanDyke, Circuit
Judges, and Kathleen Cardone,[*] District Judge.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge VanDyke

---

[*] The Honorable Kathleen Cardone, United States District Judge for
the Western District of Texas, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's dismissal of plaintiffs' claims, and remanded, in actions alleging First Amendment violations arising from the Oregon State Bar's requirement that lawyers must join and pay annual membership fees in order to practice in Oregon.

At the heart of plaintiffs' suits were two statements published alongside each other in the April 2018 edition of the Oregon State Bar's ("OSB") monthly *Bulletin*. The first, attributed to OSB and signed by its leaders, condemned white nationalism and the "normalization of violence." The second was a joint statement of the Oregon Specialty Bar Associations supporting OSB's statement. OSB maintained that both *Bulletin* statements were germane to its role of improving the quality of legal services. When plaintiffs and other members complained about the statements, OSB refunded $1.15 to plaintiffs and other objectors—the portion of their membership fees used to publish the April 2018 *Bulletin*.

In affirming the district court's dismissal of the free speech claim, the panel held that it need not decide whether the district court erred in concluding that the *Bulletin* statements were germane under *Keller v. State Bar of California*, 496 U.S. 1, 13–14 (1990) (or, in the case of the Specialty Bars' statement, not attributable to OSB) for

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

purposes of this appeal. Even assuming both statements were nongermane, plaintiffs' free speech claim failed. Plaintiffs had argued that because *Keller* relied on *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–36 (1977), to treat compulsory dues like union dues, and because *Abood* was overruled by *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2477, 2481 (2018), the court was required to apply *Janus*'s exacting scrutiny to OSB's assessment of membership fees. In rejecting this argument, the panel noted that *Keller* plainly had not been overruled and therefore could not now prohibit the very thing it permitted when decided.

The panel rejected the Crowe plaintiffs' alternative argument that, assuming mandatory dues remained constitutionally permissible, OSB failed to provide adequate procedural safeguards as required by *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). The panel held that nothing in *Keller* mandated a strict application of the *Hudson* procedures. As alleged, the OSB's refund process was sufficient to minimize potential infringement on its members' constitutional rights. The panel therefore affirmed the district court as to plaintiffs' free speech claim and the adequacy of OSB's procedural safeguards with respect to protecting plaintiffs' free speech rights.

The panel held that the district court erred by dismissing plaintiffs' free association claim as barred by precedent. The panel determined that plaintiffs raised an issue that neither the Supreme Court nor this Court have ever addressed: whether the First Amendment tolerates mandatory membership itself—independent of compelled financial support—in an integrated bar that engages in nongermane political activities. The panel concluded that plaintiffs' freedom of association

claim based on the *Bulletin* statements was viable. Because the district court erred in dismissing this claim as foreclosed by precedent, the panel reversed and remanded. On remand, the panel noted that there were a number of complicated issues that the district court would need to address, including whether *Janus* supplies the appropriate standard for plaintiffs' free association claim and, if so, whether OSB can satisfy its exacting scrutiny standard.

The panel held that the district court erred by determining that OSB was an arm of the state entitled to Eleventh Amendment immunity. The panel concluded that, on the whole, the relevant factors set forth in *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988), weighed against finding OSB an arm of the state entitled to immunity. As to the first and most important factor—whether a money judgment would be satisfied out of state funds—the panel noted that Oregon law expressly disavows State financial responsibility for OSB, which is funded by membership fees.

Concurring in part and dissenting in part, Judge VanDyke agreed with and concurred in the entirety of the panel's opinion, except the panel's resolution of the Crowe plaintiffs' inadequate procedural safeguards claim based on *Chicago Teachers Union v. Hudson.* Given the Supreme Court's decision in *Janus*, it was hard for Judge VanDyke to see how something less than *Hudson*'s safeguards could suffice in the context of compulsory bar membership dues. Accordingly, he respectfully dissented on this singular claim.

**COUNSEL**

Jacob Huebert (argued) and Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Arizona; Luke D. Miller, Military Disability Lawyer LLC, Salem, Oregon; for Plaintiffs-Appellants Daniel Z. Crowe, Lawrence K. Peterson I, and Oregon Civil Liberties Attorneys.

Michael L. Spencer (argued), Klamath Falls, Oregon, for Plaintiffs-Appellants Diane L. Gruber and Mark Runnels.

Elisa J. Dozono (argued) and Taylor D. Richman, Miller Nash Graham & Dunn LLP, Portland, Oregon; Steven M. Wilker (argued) and Megan K. Houlihan, Tonkon Torp LLP, Portland, Oregon; Michael Gillette, Schwabe Williamson & Wyatt P.C., Portland, Oregon; for Defendants-Appellees.

Ellen F. Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Christopher A. Perdue, Assistant Attorney General; Department of Justice, Salem, Oregon; for Amicus Curiae State of Oregon.

Vanessa L. Holton, General Counsel; Robert G. Retana, Deputy General Counsel; Brady R. Dewar, Assistant General Counsel; Office of the General Counsel, State Bar of California, San Francisco, California; for Amicus Curiae State Bar of California.

Mary R. O'Grady and Kimberly Friday, Osborn Maledon P.A., Phoenix, Arizona, for Amicus Curiae State Bar of Arizona.

**OPINION**

PER CURIAM:

To practice in Oregon, every lawyer must join and pay annual membership fees to the Oregon State Bar ("the Bar" or "OSB").   In these cases, Plaintiffs[1] claim these compulsions violate their freedoms of speech and association as guaranteed by the First Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

The district court dismissed all of Plaintiffs' claims, concluding that the Bar was immune from suit under the Eleventh Amendment; that Plaintiffs' free association and free speech claims were barred by precedent; and that the Bar's objection and refund procedures were constitutionally adequate.   We agree with the district court that precedent forecloses the free speech claim, but neither the Supreme Court nor this court has resolved the free association claim now before us.   For the reasons that follow, Plaintiffs may have stated a viable claim that Oregon's compulsory Bar membership requirement violates their First Amendment right of free association.   We accordingly affirm in part, reverse in part, and remand to the district court with instructions.

---

[1] "Plaintiffs" refers to Appellants in both No. 19-35463 (Daniel Crowe, Lawrence Peterson, and the Oregon Civil Liberties Attorneys (individually referred to as the "*Crowe* Plaintiffs")) and No. 19-35470 (Diane Gruber and Mark Runnels (individually referred to as the "*Gruber* Plaintiffs")).

## I. BACKGROUND

### A. *The Oregon State Bar*

"The Oregon State Bar is a public corporation and an instrumentality of the Judicial Department of the government of the State of Oregon." OR. REV. STAT. § 9.010(2). OSB is an integrated bar, meaning lawyers must join it and pay an annual membership fee to practice law in Oregon. *Id.* §§ 9.160(1), 9.200. OSB is administered by its board of governors, who may "adopt, alter, amend[,] and repeal" the Bar's bylaws. *Id.* § 9.080. "[A]t all times," the board must "serve the public interest" by "[r]egulating the legal profession and improving the quality of legal services; [s]upporting the judiciary and improving the administration of justice; and [a]dvancing a fair, inclusive[,] and accessible justice system." *Id.* The State of Oregon is not responsible for OSB's debts. *Id.* § 9.010(6). Instead, OSB satisfies its own financial needs and obligations from the membership fees it collects. *Id.* § 9.191(3). Subject to oversight by the Oregon Supreme Court, OSB administers bar exams, investigates applicants' character and fitness, formulates and enforces rules of professional conduct, and establishes minimum continuing legal education requirements for Oregon attorneys. *Id.* §§ 9.210, 9.490, 9.114.

OSB also publishes a monthly Bar *Bulletin*, which is subject to the bylaws' general communications policy:

> Communications of the Bar and its constituent groups and entities, including printed material and electronic communications, should be germane to the law, lawyers, the practice of law, the courts and the judicial system, legal

> education and the Bar in its role as a
> mandatory membership organization.
> Communications, other than permitted
> advertisements, should advance public
> understanding of the law, legal ethics and the
> professionalism and collegiality of the bench
> and Bar.

OSB Bylaws § 11.1.[2] OSB's Chief Executive Officer "has sole discretion . . . to accept or reject material submitted to the Bar for publication." *Id.* § 11.203. "[P]artisan political advertising is not allowed[,]" and "[p]artisan political announcements or endorsements will not be accepted for publication as letters to the editor or feature articles." *Id.* § 11.4.

OSB's legislative and public policy activities must reasonably relate to any of the following nine subjects:

> Regulating and disciplining lawyers;
> improving the functioning of the courts
> including issues of judicial independence,
> fairness, efficacy and efficiency; making legal
> services available to society; regulating
> lawyer trust accounts; the education, ethics,
> competence, integrity and regulation of the
> legal profession; providing law improvement
> assistance to elected and appointed
> government officials; issues involving the
> structure and organization of federal, state and
> local courts in or affecting Oregon; issues

---

[2] The OSB Bylaws are available at http://www.osbar.org/_docs/rulesregs/bylaws.pdf.

involving the rules of practice, procedure and
evidence in federal, state or local courts in or
affecting Oregon; or issues involving the
duties and functions of judges and lawyers in
federal, state and local courts in or affecting
Oregon.

*Id.* § 12.1. The Bar maintains that all its communications and
activities are intended to adhere to the above-listed topics,
and considers all these topics germane to its regulatory
purpose.

### B.  *The April 2018* Bulletin *Statements*

At the heart of Plaintiffs' suits are two statements
published alongside each other in the April 2018 edition of
the *Bulletin*, reproduced below in full.  The first was
attributed to the Bar, signed by its leaders, and stated as
follows:

**Statement on White Nationalism and
Normalization of Violence**

As the United States continues to grapple with
a resurgence of white nationalism and the
normalization of violence and racism, the
Oregon State Bar remains steadfastly
committed to the vision of a justice system
that operates without discrimination and is
fully accessible to all Oregonians. As we
pursue that vision during times of upheaval, it
is particularly important to understand current
events through the lens of our complex and
often troubled history. The legacy of that

history was seen last year in the streets of Charlottesville, and in the attacks on Portland's MAX train. We unequivocally condemn these acts of violence.

We equally condemn the proliferation of speech that incites such violence. Even as we celebrate the great beneficial power of our First Amendment, as lawyers we also know it is not limitless. A systemic failure to address speech that incites violence emboldens those who seek to do harm, and continues to hold historically oppressed communities in fear and marginalization.

As a unified bar, we are mindful of the breadth of perspectives encompassed in our membership. As such, our work will continue to focus specifically on those issues that are directly within our mission, including the promotion of access to justice, the rule of law, and a healthy and functional judicial system that equitably serves everyone. The current climate of violence, extremism and exclusion gravely threatens all of the above. As lawyers, we administer the keys to the courtroom, and assist our clients in opening doors to justice. As stewards of the justice system, it is up to us to safeguard the rule of law and to ensure its fair and equitable administration. We simply cannot lay claim to a healthy justice system if whole segments of our society are fearful of the very laws and institutions that exist to protect them.

In today's troubling climate, the Oregon State Bar remains committed to equity and justice for all, and to vigorously promoting the law as the foundation of a just democracy. The courageous work done by specialty bars throughout the state is vital to our efforts and we continue to be both inspired and strengthened by those partnerships. We not only refuse to become accustomed to this climate, we are intent on standing in support and solidarity with those historically marginalized, underrepresented and vulnerable communities who feel voiceless within the Oregon legal system.

Across the page, a "Joint Statement of the Oregon Specialty Bar Associations Supporting the Oregon State Bar's Statement on White Nationalism and Normalization of Violence" stated:

The Oregon Asian Pacific American Bar Association, the Oregon Women Lawyers, the Oregon Filipino American Lawyers Association, OGALLA-The LGBT Bar Association of Oregon, the Oregon Chapter of the National Bar Association, the Oregon Minority Lawyers Association, and the Oregon Hispanic Bar Association support the Oregon State Bar's Statement on White Nationalism and Normalization of Violence and its commitment to the vision of a justice system that operates without discrimination and is fully accessible to all Oregonians.

CROWE v. OREGON STATE BAR                13

Through the recent events from the Portland MAX train attacks to Charlottesville, we have seen an emboldened white nationalist movement gain momentum in the United States and violence based on racism has become normalized. President Donald Trump, as the leader of our nation, has himself catered to this white nationalist movement, allowing it to make up the base of his support and providing it a false sense of legitimacy. He has allowed this dangerous movement of racism to gain momentum, and we believe this is allowing these extremist ideas to be held up as part of the mainstream, when they are not. For example, President Trump has espoused racist comments, referring to Haiti and African countries as "shithole countries" and claiming that the United States should have more immigrants from countries like Norway. He signed an executive order that halted all refugee admissions and barred people from seven Muslim-majority countries, called Puerto Ricans who criticized his administration's response to Hurricane Maria "politically motivated ingrates," said that the white supremacists marching in Charlottesville, North Carolina in August of 2017 were "very fine people," and called into question a federal judge, referring to the Indiana-born judge as "Mexican," when the race of his parents had nothing to do with the judge's decision. We are now seeing the white nationalist movement grow in our state and our country under this form of leadership.

As attorneys who lead diverse bar associations throughout Oregon, we condemn the violence that has occurred as a result of white nationalism and white supremacy. Although we recognize the importance of the First Amendment of the United States Constitution and the protections it provides, we condemn speech that incites violence, such as the violence that occurred in Charlottesville. President Trump needs to unequivocally condemn racist and white nationalist groups. With his continued failure to do so, we must step in and speak up.

As attorneys licensed to practice law in Oregon, we took an oath to "support the Constitution and the laws of the United States and of the State of Oregon." To that end, we have a duty as attorneys to speak up against injustice, violence, and when state and federal laws are violated in the name of white supremacy or white nationalism. We must use all our resources, including legal resources, to protect the rights and safety of everyone. We applaud the Oregon State Bar's commitment to equity and justice by taking a strong stand against white nationalism. Our bar associations pledge to work with the Oregon State Bar and to speak out against white nationalism and the normalization of racism and violence.

OSB maintains both *Bulletin* statements are germane to its role in improving the quality of legal services. When

Plaintiffs and other OSB members complained about the statements, however, the Bar refunded $1.15 to Plaintiffs and other objectors—the portion of their membership fees used to publish the April 2018 *Bulletin*. On appeal, the Bar explains it paid the refunds because "it has always sought, in accordance with its Bylaws, to strictly adhere to the standards of 'germane' speech as set forth in *Keller* . . . . [T]he Bar sought to avoid even the appearance of funding non-germane speech, by refunding their proportional dues with interest."

C.  *District Court Proceedings*

Plaintiffs filed these lawsuits against OSB officials and OSB itself, alleging the compelled membership and membership fee requirements violate their First Amendment rights. Plaintiffs contend that (1) the two statements from the April 2018 *Bulletin* are not germane; (2) compelling them to join and maintain membership in OSB violates their right to freedom of association; and (3) compelling Plaintiffs to pay—without their prior, affirmative consent—annual membership fees to OSB violates their right to freedom of speech. In addition, the *Crowe* Plaintiffs alone contend that the Bar's constitutionally mandated procedural safeguards for objecting members are deficient. And the *Gruber* Plaintiffs alone continue to argue on appeal that OSB is not entitled to sovereign immunity from suit.

Below, these cases were referred to a magistrate, who first determined that OSB (but not the individual OSB officials) was an "arm of the state" and immune from suit pursuant to the Eleventh Amendment. The magistrate then held the OSB statement "was made within the specific context of promotion of access to justice, the rule of law, and a healthy and functional judicial system that equitably serves everyone" and

"[wa]s germane to improving the quality of legal services."
Assuming the Specialty Bars' statement could "include[]
political speech that is not germane to a permissible topic,"
the magistrate noted it was not technically attributed to OSB
but rather a "routinely publishe[d] statement[]" in the
*Bulletin*'s "forum for the exchange of ideas pertaining to the
practice of law." The magistrate alternatively concluded that,
even assuming the statements contained nongermane speech,
Plaintiffs would still have suffered no constitutional injury
because of OSB's existing safeguards designed to refund
membership funds misused for political purposes.

The magistrate recommended the district court grant the
Bar's motions to dismiss and deny the *Gruber* Plaintiffs'
motion for partial summary judgment. The district court fully
adopted the magistrate's findings and recommendations and
dismissed these cases. Plaintiffs timely appealed.

## II.  STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C.
§ 1331 and 28 U.S.C. § 1343. We have jurisdiction under
28 U.S.C. § 1291, and "review de novo a dismissal on the
basis of sovereign immunity or for failure to state a claim
upon which relief can be granted." *Ariz. Students' Ass'n v.
Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016).
Moreover, we must "accept the complaint[s'] well-pleaded
factual allegations as true, and construe all inferences in the
plaintiff[s'] favor." *Id*.

## III.  DISCUSSION

Plaintiffs raise the same issues that were before the
district court in their appeals. We will begin with Plaintiffs'

free speech and free association claims. We consider the parties' arguments with respect to the germaneness of the April 2018 *Bulletin* statements and the adequacy of OSB's procedural safeguards as they pertain to Plaintiffs' free speech and free association claims. Because we conclude that Plaintiffs have stated a claim based on their right to free association, which we must remand to the district court, we will then address the question of OSB's immunity from a suit for damages, a claim only raised by the *Gruber* Plaintiffs.

## A. *Free Speech*

In *Keller v. State Bar of California*, 496 U.S. 1, 13–14 (1990), the Supreme Court concluded that a state bar may use mandatory dues to subsidize activities "germane to those goals" of "regulating the legal profession and improving the quality of legal services" without running afoul of its members' First Amendment rights of free speech. *Id.* As a preliminary matter, Plaintiffs argue that both April 2018 *Bulletin* statements constitute political speech nongermane to the Bar's role in regulating the legal profession. We need not decide whether the district court erred in concluding that the *Bulletin* statements are germane under *Keller* (or, in the case of the Specialty Bars' statement, not attributable to OSB) for purposes of this appeal because, even assuming both statements are nongermane, Plaintiffs' free speech claim fails.

In rejecting the plaintiffs' free speech claim in *Keller*, the Supreme Court subjected integrated bars to "the same constitutional rule with respect to the use of compulsory dues as are labor unions." *Keller,* 496 U.S. at 13 (adopting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–36 (1977) (holding that a union may not fund from mandatory fees political or ideological activities nongermane to its collective bargaining

duties)).  However, the Supreme Court recently overruled *Abood* because the "line between chargeable [germane] and nonchargeable [nongermane] union expenditures has proved to be impossible to draw with precision," and because even union speech germane to collective bargaining "is overwhelmingly of substantial public concern." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2477, 2481 (2018).  Plaintiffs argue that, given *Keller*'s reliance on *Abood*, faithful application of *Keller* now requires that we consult *Janus* in analyzing their *Keller* claim and apply exacting scrutiny. *See id.* at 2477, 2486.  According to Plaintiffs, OSB engages in political and ideological activities (e.g., the *Bulletin* statements), so forcing them to pay mandatory membership fees violates their free speech rights. Plaintiffs urge that, under *Janus*, OSB's membership fee requirement cannot survive exacting scrutiny, and therefore, membership fees may only be constitutionally assessed if attorneys provide prior, affirmative consent.

Given *Keller*'s instruction that integrated bars adhere to the same constitutional constraints as unions, 496 U.S. at 13, Plaintiffs' argument is not without support.  But *Keller* plainly has not been overruled. *See Janus*, 138 S. Ct. at 2498 (Kagan, J., dissenting) (noting that "today's decision does not question" cases applying *Abood*, including *Keller*).  Although *Abood*'s rationale that *Keller* expressly relied on has been clearly "rejected in [another] decision[], the Court of Appeals should follow the [Supreme Court] case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).  We are a lower court, and we would be scorning *Agostini*'s clear

directive if we concluded that *Keller* now prohibits the very thing it permitted when decided.[3]

In the alternative, the *Crowe* Plaintiffs alone insist that, assuming mandatory dues remain constitutionally permissible, the district court nevertheless erred in concluding that OSB provides adequate procedural safeguards. As discussed above, *Keller* subjected integrated bars to the same constitutional constraints as unions, allowing them to use compulsory dues only to regulate attorneys or improve the quality of their States' legal professions—but not for "activities of an ideological nature which fall outside of those areas of activity." 496 U.S. at 13–14. Having saddled integrated bars with this "*Abood* obligation," the Court concluded they could satisfy that obligation "by adopting the sort of procedures described in *Hudson*." *Id.* at 17 (referencing *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)). At a minimum, *Hudson*'s safeguards "include an adequate explanation of the basis for the [compulsory] fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Hudson,* 475 U.S. at 310.

Here, OSB's bylaws provide a dispute resolution procedure for a "member of the Bar who objects to the use of any portion of the member's bar dues for activities he or she considers promotes or opposes political or ideological causes . . . ." OSB Bylaws § 12.600. The objecting member must

---

[3] Because we do not think the Supreme Court has clearly abrogated or altered *Keller*'s holding, our precedent likewise bars Plaintiffs' requested relief as to this claim. *See Gardner v. State Bar of Nev.*, 284 F.3d 1040, 1042–43 (9th Cir. 2002).

notify OSB's Board of Governors, and "[i]f the Board agrees with the member's objection, it will immediately refund the portion of the member's dues that are attributable to the activity, with interest." *Id.* § 12.601. If the Board disagrees with the objecting member, it offers binding arbitration before a neutral decisionmaker who conducts a hearing and promptly decides "whether the matters at issue are acceptable activities for which compulsory fees may be used under applicable constitutional law." *Id.* § 12.602. If the objector prevails, OSB pays the same refund described above; conversely, if OSB prevails, the matter is closed. *Id.*

The *Crowe* Plaintiffs argue that OSB's procedures are deficient because (1) OSB does not provide an independently audited report[4] explaining how mandatory dues are calculated; and (2) OSB does not provide the required escrow procedure. We disagree.

First, to the extent the *Crowe* Plaintiffs urge us to require wholesale application of the procedures in *Hudson* in this context, we decline to do so. Nowhere does *Keller* require state bars to adopt procedures identical to or commensurate with those outlined in *Hudson*. 496 U.S. at 17 ("[A]n integrated bar *could* certainly meet its *Abood* obligation by adopting the *sort of procedures* described in *Hudson*.") (emphasis added). Indeed, the Court in *Keller* explicitly recognized that it lacked the "developed record" available in *Hudson* and accordingly held that "[q]uestions [of] whether one or more alternative procedures would likewise satisfy that obligation are better left for consideration upon a more fully developed record." *Id.* Thus, we decline to require an

---

[4] Plaintiffs concede that OSB publishes information about its allocation of membership fees each year.

independently audited report and escrow solely because *Hudson* required as much.

Nor are we persuaded that adherence to *Hudson* is necessary—or even effective—to minimize infringement here. With respect to the independent audit, *Hudson* required this high-level explanation in the context of a union that affirmatively planned to engage in activities unrelated to collective bargaining for which it could only charge its members. 475 U.S. at 298. The Court obligated the union to provide a detailed statement of fees in advance so that nonmembers could object before being charged for impermissible activities. *Id.* at 305–07. *Hudson* fashioned the escrow requirement for the same reason—to "avoid the risk that [nonmembers'] funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Id.* at 305.

The *Crowe* Plaintiffs do not allege any similarly affirmative plans by OSB to use Bar members' dues for nongermane purposes. Indeed, OSB maintains a policy mandating that dues be used for germane activities and communications. *See, e.g.,* OSB Bylaws §§ 11.1, 12.1. As a practical matter, then, advance notice would not have offered additional protection against the alleged constitutional violations because OSB would have characterized all of its activities as germane.[5] Similarly, an escrow requirement would not further minimize risk of infringement because,

---

[5] We recognize that there is an argument to be made regarding the propriety of permitting OSB to define for itself what is germane. That is not before us. Moreover, such an argument does not alter the fact that advance notice in this case would not have prevented Plaintiffs' asserted constitutional injury.

unlike in *Hudson*, the allegedly impermissible speech is only identifiable after the fact.

A refund, which Plaintiffs received here, is the only meaningful remedy for Plaintiffs' alleged injuries. Under the circumstances, OSB provides procedures adequately tailored to "minimize the infringement" of its members' First Amendment rights. *Hudson*, 475 U.S. at 303. Indeed, we have observed, albeit in dicta, that "allow[ing] members to seek a refund of the proportion of their dues that the State Bar has spent on political activities unrelated to its regulatory function" complies with *Keller*. *Morrow v. State Bar of California*, 188 F.3d 1174, 1175 (9th Cir. 1999). OSB clearly provides that process here.

In sum, nothing in *Keller* mandates a strict application of the *Hudson* procedures. Indeed, an application of such procedures here would not have provided greater protections for Plaintiffs. As alleged, the OSB's refund process is sufficient to minimize potential infringement on its members' constitutional rights. We therefore affirm the district court as to Plaintiffs' free speech claim and the adequacy of OSB's procedural safeguards with respect to protecting Plaintiffs' free speech rights.

B. *Free Association*

In Oregon, "a person may not practice law . . . unless the person is an active member of the Oregon State Bar." OR. REV. STAT. § 9.160(1). Plaintiffs claim that because OSB engages in nongermane political activity like the *Bulletin* statements, this membership requirement violates their freedom of association under the First and Fourteenth Amendments. We first must decide whether the district court

erred by concluding this claim was foreclosed by existing precedent.

1. Does existing precedent foreclose Plaintiffs' Free Association claim?

In *Keller*, the Supreme Court expressly declined to address the "freedom of association claim" that attorneys "cannot be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*." 496 U.S. at 17. *Keller* explained this unaddressed claim was "much broader . . . than [the claim] at issue in *Lathrop*." *Id.* (discussing *Lathrop v. Donohue*, 367 U.S. 820 (1961)). Plaintiffs here insist they have presented precisely this yet-to-be-resolved free association claim. The district court concluded that *Lathrop* and *Keller* foreclosed Plaintiffs' association claim, so we examine those cases in turn.

In *Lathrop*, a plurality of the Supreme Court held:

> [T]he Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity.

367 U.S. at 843. On its own terms, *Lathrop*'s "free association" decision was limited to "compelled financial support of group activities," *id.* at 828; the Court emphasized that "[t]he only compulsion to which [Lathrop] ha[d] been subjected by the integration of the bar [wa]s the payment of the annual dues of $15 per year." *Id.* at 828 ("We therefore are confronted . . . *only* with a question of compelled financial support of group activities, *not with involuntary membership in any other aspect*.") (emphasis added).[6]

Lathrop also complained that the Wisconsin Bar engaged in lobbying. *See Lathrop*, 367 U.S. at 827. But the *Lathrop* plurality presumed, on the bare record before it, that all the bar's activities, including lobbying, related to "the regulatory program" of "improving the profession." *Id.* at 843. In other words, from what little the *Lathrop* plurality could divine, even the bar's lobbying was germane to the regulatory purposes justifying compelled financial association in the first place. *Id. Lathrop*'s ultimate conclusion was deliberately limited: a state "may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program." *Id.* At bottom, *Lathrop* merely permitted states to compel practicing lawyers to pay toward the costs of regulating their profession. *See Keller*, 496 U.S. at 9 (discussing "the limited scope of the question [*Lathrop*] was deciding").

---

[6] The Supreme Court framed its decision in this way even though Lathrop's actual free association claim was *similar* to the broader one Plaintiffs raise here. *Lathrop*, 367 U.S. at 827 ("The core of appellant's argument is that he cannot constitutionally be compelled to join . . . an organization which . . . utilizes its property, funds and employees for the purposes of influencing legislation and public opinion toward legislation.").

Decades later, the Court revisited the issue in *Keller*. As discussed above, *Keller*, like *Lathrop*, concluded that states could compel practicing attorneys to pay dues to an integrated bar but that those dues could only "constitutionally fund activities germane to those goals" of "regulating the legal profession and improving the quality of legal services." *Id.* at 13–14. *Keller* then augmented the constitutional analysis, prohibiting integrated bars from funding with mandatory dues "activities having political or ideological coloration which are not reasonably related to the advancement of [its regulatory] goals." *Id.* at 15. In a later compelled speech case, the Supreme Court explained that "[t]he central holding in *Keller* . . . was that the objecting members were not required to give speech subsidies for matters not germane to the larger *regulatory* purpose which justified the required association." *United States v. United Foods, Inc.*, 533 U.S. 405, 414 (2001) (emphasis added).

Crucially, *Keller* expressly declined to address the petitioners' separate free association claim: "that they cannot be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*." *Keller*, 496 U.S. at 17. *Keller* acknowledged this was "a much broader freedom of association claim than was at issue in *Lathrop*." *Id.* (explaining that the *Keller* petitioners' free association claim challenged more than "their 'compelled financial support of group activities'" (quoting *Lathrop*, 367 U.S. at 828)). *Keller* and *Lathrop* thus speak for themselves: the Supreme Court has never resolved this broader free association claim based on compelled bar membership.

Nor have we.  In *Morrow*, the "plaintiffs complain[ed] that by virtue of their mandatory State Bar membership, they [we]re associated in the public eye with viewpoints they d[id] not in fact hold . . . [which] violate[d] their First Amendment rights to free association."  188 F.3d at 1175 ("The issue is whether plaintiffs' First Amendment rights are violated by their compulsory membership in a state bar association that conducts political activities beyond those for which mandatory financial support is justified.").  This is, essentially, the same claim Plaintiffs raise here.  Just like the instant claim, the *Morrow* plaintiffs raised the "much broader freedom of association claim" that *Keller* and *Lathrop* left unresolved.  *See Morrow*, 188 F.3d at 1177 ("Plaintiffs nevertheless contend that language in *Keller* leaves open the question whether membership alone may cause the public to identify plaintiffs with State Bar positions in violation of plaintiffs' First Amendment rights.").  Nevertheless, we did not resolve that claim.

When we reached the *Morrow* plaintiffs' association claim, we essentially reformulated it: "[h]ere, plaintiffs do not allege that they are compelled to associate in any way with the California State Bar's political activities."  *Id.*  By reformulating the claim, *Morrow* held that the claim before it was "no broader than that in *Lathrop*," and noted "[t]he claim reserved in *Keller* was a broader claim of violation of associational rights than was at issue in either *Lathrop* or in this case."  *Id.*  Our avoidance of this broader free association claim cannot preclude Plaintiffs' efforts to resolve it here.

Accordingly, Plaintiffs raise an issue that neither the Supreme Court nor we have ever addressed: whether the First Amendment tolerates mandatory membership itself—independent of compelled financial support—in an integrated

bar that engages in nongermane political activities. In concluding that precedent foreclosed this claim, the district court erred.

2. Plaintiffs' free association claim is viable.

The First Amendment protects the basic right to freely associate for expressive purposes; correspondingly, "[t]he right to eschew association for expressive purposes is likewise protected." *Janus*, 138 S. Ct. at 2463 (citing *Roberts v. U.S. Jaycees,* 468 U.S. 609, 623 (1984)). Freedom from compelled association protects two inverse yet equally important interests. First, it shields individuals from being forced to "confess by word or act their faith" in a prescriptive orthodoxy or "matters of opinion" they do not share. *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Second, because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958), freedom from compelled association checks the power of "official[s], high or petty, [to] prescribe what [opinions] shall be orthodox." *Barnette*, 319 U.S. at 642. In short, like the "freedom of belief," freedom from compelled association "is no incidental or secondary aspect of the First Amendment's protections." *Abood*, 431 U.S. at 235.

Plaintiffs' freedom of association claim based on the April 2018 *Bulletin* statements is viable. Because the district court erred in dismissing this claim as foreclosed by our precedent, we reverse and remand.

On remand, there are a number of complicated issues that the district court will need to address. To begin, the district

court will need to determine whether *Janus* supplies the appropriate standard for Plaintiffs' free association claim and, if so, whether OSB can satisfy its "exacting scrutiny standard." *Janus*, 138 S. Ct. at 2477; *see also, e.g.*, *Fleck v. Wetch*, 139 S. Ct. 590 (2018) (remanding a mandatory bar membership case for further consideration in light of *Janus*). Given that we have never addressed such a broad free association claim, the district court will also likely need to determine whether *Keller*'s instructions with regards to germaneness and procedurally adequate safeguards are even relevant to the free association inquiry. To avoid issuing an advisory opinion, we defer consideration of these issues at this stage of the case. *See Ball v. Rodgers*, 492 F.3d 1094, 1119 (9th Cir. 2007) (declining to address an issue "at this time" until after the district court has an opportunity to review on remand in light of the court's instructions related to separate issues).

## C.  *Sovereign Immunity*

As set forth above, the district court adopted the magistrate's recommendation, in which the magistrate determined that OSB is "an arm of the state entitled to Eleventh Amendment Immunity." Although the magistrate cited several district court decisions and unpublished Ninth Circuit dispositions[7] that have alluded to this conclusion, this is a matter of first impression before this court. The Eleventh Amendment bars, with a few exceptions (*see*, *e.g.*, *Ex parte*

---

[7] Of note, the district court cited to our unpublished disposition in *Eardley v. Garst*, 232 F.3d 894 (9th Cir. 2000). Our circuit rules prohibit citations to unpublished dispositions issued prior to January 1, 2007 except in limited circumstances, none of which are present here. *See* 9th Cir. R. 36.

*Young*, 209 U.S. 123 (1908)), federal suits against unconsenting states, their agencies, and their officers "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "[N]ot all state-created or state-managed entities are immune from suit in federal court . . . . an entity may be organized or managed in such a way that it does not qualify as an arm of the state entitled to sovereign immunity." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991).

In *State ex rel. Frohnmayer v. Oregon State Bar*, the Oregon Supreme Court held that OSB is a state agency as defined by its public records law. 767 P.2d 893, 895 (Or. 1989); *see also* OR. REV. STAT. § 192.311(6) ("'State Agency' means any state officer, department, board, commission or court created by the Constitution or statutes of this state . . . ."). And we acknowledge that the Oregon Supreme Court "is the final authority on the 'governmental' status of the [Bar] for purposes of state law. But its determination . . . is not binding on [federal courts] when . . . [deciding] a federal question." *Keller*, 496 U.S. at 11. We think that *Frohnmayer* has answered, definitively, an important question: Is the Oregon State Bar a state actor? The Oregon Supreme Court has said "Yes," and that means that OSB is bound by those provisions of the U.S. Constitution that bind state actors, such as the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See*, *e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 717 (1961). Finding that an entity is the "state" for purposes of the First Amendment or the Due Process and Equal Protection Clauses, however, is not the same as concluding that the entity is the "state" for purposes of the Eleventh Amendment. *See*, *e.g.*, *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658,

690 n.54 (1978) (explaining there is no " basis for concluding that the Eleventh Amendment is a bar to municipal liability" in § 1983 suits). We recently discussed the different tests for state action and, as we will see, they are quite different from our consideration of factors required for sovereign immunity. *See Pasadena Republican Club v. W. Just. Ctr.*, —F.3d—, 2021 WL 235775, at *4 (9th Cir. Jan. 25, 2021) (listing various tests for state action). Accordingly, *Frohnmayer* does not answer the question before us: Whether OSB is an arm of the state entitled to immunity under the Eleventh Amendment.

To determine whether OSB, which is "an instrumentality of the . . . government of the State of Oregon," OR. REV. STAT. § 9.010(2), is an arm of the state entitled to immunity, we apply the *Mitchell* framework. *See Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988). The *Mitchell* factors are as follows:

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity. To determine these factors, the court looks to the way state law treats the entity.

*Id.* (citation omitted). OSB "bear[s] the burden of proving the facts that establish its immunity under the Eleventh Amendment." *ITSI TV Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1292 (9th Cir. 1993). We conclude that, on the whole,

the factors weigh against finding OSB an "arm of the state" entitled to immunity.

### 1. Vulnerability of the State's treasury

The first factor—whether a money judgment would be satisfied out of state funds—weighs strongly against immunity because Oregon law clearly answers this question in the negative. OR. REV. STAT. § 9.010(6) ("No obligation of any kind incurred or created under this section shall be, or be considered, an indebtedness or obligation of the State of Oregon.").

In this circuit, "the source from which the sums sought by the plaintiff must come is the most important single factor in determining whether the Eleventh Amendment bars federal jurisdiction." *Durning*, 950 F.2d at 1424 (citing *Rutledge v. Ariz. Bd. of Regents*, 660 F.2d 1345, 1349 (9th Cir. 1981); *Ronwin v. Shapiro*, 657 F.2d 1071, 1073 (9th Cir. 1981); *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982)). Unlike the district court, we are not inclined to discount the importance of this factor.[8] Although it is true that "[t]he Eleventh Amendment does not exist solely . . . to prevent federal-court judgments that must be paid out of a State's treasury," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) (cleaned up), "the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess v. Port Auth. Trans-Hudson Corp.*,

---

[8] The district court suggested that this factor carries less weight in cases for primarily equitable relief. But even assuming such a distinction bears on the weight of this factor, it has little effect here as both complaints seek the return of OSB membership fees Plaintiffs have paid during the statute of limitations period.

513 U.S. 30, 48 (1994). Indeed, as the Supreme Court acknowledged in *Hess*, "the vast majority of Circuits . . . have generally accorded this factor dispositive weight." 513 U.S. at 49 (internal quotation marks omitted). We certainly have, *see Durning*, 950 F.2d at 1424 (citing cases).

Nor are we persuaded by the district court's observation that, "[d]espite the fact the Bar alone is responsible for any money damages it may incur. . . . [a]ny money judgment would come from the Bar's collection of fees that is made possible because the State authorized the Bar to collect those fees." Rather, we find OSB's collection of dues weighs against immunity, for like the bar in *Keller*, OSB's "principal funding comes, not from appropriations made to it by the legislature, but from dues levied on its members by the board of governors." 496 U.S. at 11.[9]

In short, Oregon law expressly disavows State financial responsibility for OSB, which is funded by membership fees. Therefore, the first and most important *Mitchell* factor weighs strongly against immunity.

2. Central government functions

*Mitchell*'s second factor, "whether the entity performs central governmental functions," is a closer call, but we conclude that it weighs slightly against immunity. *Mitchell*, 861 F.2d at 201. To be sure, OSB, "an instrumentality of

---

[9] The district court further opined, in a footnote, that if Plaintiffs succeeded in eliminating mandatory membership fees, the regulatory costs to the State would correspondingly increase. These concerns, however well-intentioned, exceed the proper scope of this first factor's inquiry: Whether a money judgment would be satisfied out of state funds.

[Oregon's] Judicial Department," performs important government functions. OR. REV. STAT. § 9.010(2). The district court detailed how the Bar, subject to the review and direction of the Oregon Supreme Court, manages bar examinations and attorney admissions, discipline, resignations, and reinstatements; and how the Oregon Supreme Court approves changes to some OSB bylaws, adopts rules of professional conduct, reviews OSB's annual financials, and approves its budget for certain activities.

We agree that OSB "undoubtedly performs important and valuable services for the State by way of governance of the profession." *Keller*, 496 U.S. at 11. But like the integrated bar in *Keller*, "those services are essentially advisory in nature." *Id.* Integrated bars are "a good deal different from most other entities that would be regarded in common parlance as governmental agencies." *Id.* (internal quotation marks omitted). OSB "was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession." *Id.* at 13. And although *Keller* never specifically addressed sovereign immunity, its analysis is pertinent and analogous to the immunity question here. *Keller* identified (after a lengthy discussion) constitutionally significant differences between an integrated bar and "traditional government agencies and officials." *Id.* On that basis, the Supreme Court rejected the argument that "the bar is considered a governmental agency" that is "exempted . . . from any constitutional constraints on the use of its dues." *Id.* at 10. Indeed, this was the principal basis on which the Supreme Court reversed the California Supreme Court in *Keller*. *Id.* at 11–13.

Moreover, the second *Mitchell* factor inquiry must be guided by "[t]he treatment of the entity under state law."

*Durning*, 950 F.2d at 1426.  The *Gruber* Plaintiffs point out that under Oregon law, the Oregon Supreme Court—not OSB—makes final decisions on admitting attorneys, disciplining attorneys, and adopting rules of professional conduct.  These same considerations convinced the Supreme Court in *Keller* that the California bar was not "the typical government official or agency," but rather a professional association that provided recommendations to the ultimate regulator of the legal profession.  496 U.S. at 11–12 (reversing the California Supreme Court's conclusion to the contrary).  The Oregon Supreme Court exerts the same direct, regulatory control over Oregon attorneys.  *See Ramstead v. Morgan*, 347 P.2d 594, 601 (Or. 1959) ("No area of judicial power is more clearly marked off . . . than the courts' power to regulate the conduct of the attorneys who serve under it.").  Given OSB's similarity to the integrated bar in *Keller*, we find that the second *Mitchell* factor weighs slightly against immunity.[10]  We note that even if we were inclined to discount *Keller*—which we cannot—and view OSB's functions as central government functions, the second *Mitchell* factor is, at most, a wash for OSB because the remaining four factors weigh against immunity.

3.  Power to sue or be sued

Oregon law unequivocally imparts to OSB the power to sue and be sued.  OR. REV. STAT. § 9.010(5).  This factor thus

---

[10] Our pre-*Mitchell* decisions in *O'Connor v. State of Nevada*, 686 F.2d 749, 750 (9th Cir. 1982) and *Ginter v. State Bar of Nevada* 625 F.2d 829, 830 (9th Cir. 1980) do not require a contrary result.  Neither opinion offers an explanation as to *why* the Nevada state bar is an arm of the state.  More importantly, our present inquiry concerns Oregon's state bar—not Nevada's.

militates against immunity. The district court nevertheless reasoned to the contrary because Oregon law elsewhere provides civil immunity to the Bar and its officials in the performance of their duties related to admissions, licensing, reinstatements, disciplinary proceedings, and client security fund claims. OR. REV. STAT. §§ 9.537(2), 9.657. We are not persuaded that limited grants of immunity for specific functions cancel out the clear statutory grant of the power to sue or be sued. In any event, we have recognized that although this factor warrants "some consideration, [it] is entitled to less weight than the first two factors." *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 254 (9th Cir. 1992). As such, this factor weighs slightly against immunity.

### 4. Power to take property in its own name

It is clear that OSB may "enter into contracts and lease, acquire, hold, own, encumber, insure, sell, replace, deal in and with and dispose of real and personal property." OR. REV. STAT. § 9.010(5). This factor accordingly weighs against immunity.

### 5. Corporate status

"[OSB] is a public corporation and an instrumentality of . . . the State." *Id.* § 9.010(2). But because the Bar appoints its own leaders, amends most of its bylaws, and manages its internal affairs, OSB "is a corporate entity sufficiently independent from the state." *Durning*, 950 F.2d at 1428. Our decision in *Durning* is illustrative here. There, the Wyoming Community Development Authority was "a *body corporate* operating as a state instrumentality operated solely for the public benefit" and its board was government appointed. *Id.* at 1427 (emphasis in original). Yet *Durning* concluded the

fifth *Mitchell* factor weighed against immunity. *Id.* at 1428. We reach the same conclusion here, for OSB is even more independent than the Authority in *Durning*. OSB's Board of Governors, for instance, are not government appointed. OR. REV. STAT. § 9.025(1)(a). The Board appoints OSB's CEO. *Id.* § 9.055. And OSB "has the authority to . . . regulat[e] and manag[e] . . . [its own affairs]." *Id.* § 9.080(1).

* * *

In sum, three factors, including the first and most important, weigh against immunity and the other two still lean slightly against immunity. The *Mitchell* factors thus compel the conclusion that OSB is not an "arm of the state" entitled to immunity. We note that even viewing two factors as neutral, OSB has not met its burden to prove immunity.

## IV. CONCLUSION

In light of the foregoing, the district court is **AFFIRMED IN PART**, **REVERSED IN PART**, and these cases are **REMANDED** for further proceedings consistent with this opinion.

---

VANDYKE, Circuit Judge, concurring in part and dissenting in part:

I agree with and concur in the entirety of the panel's opinion in these cases, except its resolution of the *Crowe* Plaintiffs' inadequate procedural safeguards claim based on *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986).

At first blush, it's not obvious to me that the Bar's existing after-the-fact safeguards, which no one disputes fail to comply with the Supreme Court's direction in *Hudson*, adequately "prevent[] compulsory subsidization of ideological activity by" objecting bar members. *Id.* at 302 (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 237 (1977)). As the panel's opinion correctly concludes, even though the Supreme Court seems to have moved on from the *Abood* rationale upon which its *Keller* decision relied, we must still follow *Keller* and thus reject Plaintiffs' free speech claims in these cases. But I don't think that requires us to go further and ignore that the Supreme Court has now concluded even *Hudson*'s minimal safeguards are not enough in other contexts. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2482, 2486 (2018) (concluding that "the *Hudson* notice in the present case and in others that have come before us do not begin to permit" objectors to protect their First Amendment rights, and overruling *Abood*).

Given these developments in the law, it is hard for me to see how something less than *Hudson*'s safeguards could suffice in the context of compulsory bar membership dues. *Keller* said that "an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*," *Keller v. State Bar of California*, 496 U.S. 1, 17 (1990), which of course we are bound by until the Supreme Court tells us otherwise. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). But *Keller* never addressed what procedures *less protective* than those required by *Hudson* would suffice. Even assuming some type(s) of less protective procedures might have been defensible before *Janus* overruled *Abood*, it doesn't strike me as very defensible now that the Supreme Court has told us *Hudson*'s procedures are

no longer sufficient in other contexts. Following *Keller* and *Janus* and *Agostini*, it may be that *Hudson*'s requirements are now both a floor and a ceiling for integrated bars—at least until the Supreme Court gives us more guidance.

Ultimately, however, I would address the *Crowe* Plaintiffs' inadequate safeguards claim by not doing so in this appeal. We are remanding Plaintiffs' free association claim, and if on remand they prevail on that claim, the Bar will presumably need to change its bylaws, and maybe its entire structure. Because such alterations would likely change the procedures the *Crowe* Plaintiffs currently challenge, I don't think it is necessary that we review those procedures at this stage of the case. To avoid issuing an advisory opinion, I would defer consideration of this issue. *See Ball v. Rodgers*, 492 F.3d 1094, 1119 (9th Cir. 2007) (declining to address a claim "at this time," and waiting until after the district court on remand reviews the claim anew in light of our court's instructions on separate issues that could affect that claim). Accordingly, I respectfully dissent on this singular claim.