**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL Z. CROWE, | No. 23-35193 |
| *Plaintiff-Appellant*, | D.C. No. 3:18-cv-02139-JR |
| OREGON CIVIL LIBERTIES ATTORNEYS, an Oregon nonprofit corporation, | OPINION |
| *Plaintiff-Appellant*, | |
| and | |
| LAWRENCE K. PETERSON I, | |
| *Plaintiff*, | |
| v. | |
| OREGON STATE BAR, a Public Corporation; OREGON STATE BAR BOARD OF GOVERNORS; VANESSA A. NORDYKE, President of the Oregon State Bar Board of Governors; CHRISTINE CONSTANTINO, President-elect of the Oregon State Bar Board of Governors; HELEN MARIE | |

HIERSCHBIEL, Chief Executive
Officer of the Oregon State Bar;
KEITH PALEVSKY, Director of
Finance and Operations of the Oregon
State Bar; AMBER HOLLISTER,
General Counsel for the Oregon State
Bar,

*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted April 2, 2024
Portland, Oregon

Filed August 28, 2024

Before:  John B. Owens and Michelle T. Friedland, Circuit
Judges, and William Horsley Orrick,[*] District Judge.

Opinion by Judge Friedland

---

[*] The Honorable William Horsley Orrick, United States District Judge
for the Northern District of California, sitting by designation.

# SUMMARY[**]

## First Amendment/Bar Dues

In an action brought by attorney Daniel Crowe alleging that the requirement that he join the Oregon State Bar ("OSB") infringes his First Amendment right to freedom of association, the panel dismissed his claims against OSB and his claims against OSB officers for retrospective relief, reversed the district court's summary judgment for OSB officers on his claims for prospective equitable relief, and remanded.

Applying *Kohn v. State Bar of California*, 87 F.4th 1021 (9th Cir. 2023) (en banc), the panel held that OSB is an arm of the state entitled to sovereign immunity, and therefore dismissed Crowe's claims against OSB. Sovereign immunity also precludes Crowe's claims for retrospective relief against individual OSB officers sued in their official capacities. However, sovereign immunity does not bar Crowe's claims for prospective declaratory and injunctive relief against individual OSB officers.

The panel held that Crowe demonstrated an infringement on his freedom of association because he objected to certain statements by OSB in its magazine that would reasonably have been imputed to OSB's members. Considering the totality of the circumstances, OSB traded on its supposedly unified membership to bolster its own expression, fostering a misperception about the unanimity of its members' views.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Crowe established that OSB impaired his own expression because he objected to the message sent by his membership.

The panel held that the infringement on Crowe's freedom of association did not survive exacting scrutiny because OSB's communications were not related to the Bar's regulatory purpose. Accordingly, the panel reversed the district court's judgment as to Crowe's freedom of association claim for prospective equitable relief against individual OSB officers and remanded for further proceedings.

---

**COUNSEL**

Scott D. Freeman (argued) and Adam C. Shelton, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Arizona; Luke D. Miller, Military Disability Lawyer LLC, Salem, Oregon; for Plaintiffs-Appellants.

Kristin M. Asai (argued), Paul Matthias-Bennetch, and Abigail Gore, Holland & Knight LLP, Portland, Oregon, for Defendants-Appellees.

---

**OPINION**

FRIEDLAND, Circuit Judge:

Attorney Daniel Crowe sued the Oregon State Bar and its officers, arguing that the requirement that he join the Bar infringes his First Amendment right to freedom of association.  We hold that the Oregon State Bar is an arm of

the state entitled to sovereign immunity, so the Bar itself must be dismissed as a defendant.  But we hold, as to the officer defendants, that Crowe has demonstrated an infringement on his freedom of association because he objects to certain communications by the Bar that would reasonably have been imputed to the Bar's members.  We also hold that the infringement was not justified because the communications in question were not related to the Bar's regulatory purpose.  We therefore reverse the district court's judgment for the officer defendants on Crowe's freedom of association claim and remand for further proceedings.

## I.

## A.

To practice law in Oregon, an attorney must be a member of the Oregon State Bar ("OSB").  Or. Rev. Stat. § 9.160(1).  An attorney must also pay annual membership dues, which are used to fund OSB's activities.  *Id.* §§ 9.191, 9.200.  Those activities include administering bar exams, formulating and enforcing rules of professional conduct, and establishing minimum continuing legal education requirements for Oregon attorneys.  *Id.* §§ 9.210, 9.490, 9.112.  OSB also lobbies the state legislature and publishes a magazine called the *Bulletin*.  *See* OSB Bylaws art. 10 (bylaws for OSB communications), 11 (bylaws for legislation and public policy activities).

In the April 2018 issue of the *Bulletin*, OSB published two statements on "White Nationalism and [the] Normalization of Violence."  The two statements were published on facing pages, surrounded by a single dark green border that was not present on the other pages of the magazine.  The first statement had OSB's dark green logo on the top of the page, and it was signed by six OSB officers,

including the President and the Chief Executive Officer. That statement said:

### Statement on White Nationalism and Normalization of Violence

As the United States continues to grapple with a resurgence of white nationalism and the normalization of violence and racism, the Oregon State Bar remains steadfastly committed to the vision of a justice system that operates without discrimination and is fully accessible to all Oregonians. As we pursue that vision during times of upheaval, it is particularly important to understand current events through the lens of our complex and often troubled history. The legacy of that history was seen last year in the streets of Charlottesville, and in the attacks on Portland's MAX train. We unequivocally condemn these acts of violence.

We equally condemn the proliferation of speech that incites such violence. Even as we celebrate the great beneficial power of our First Amendment, as lawyers we also know it is not limitless. A systemic failure to address speech that incites violence emboldens those who seek to do harm, and continues to hold historically oppressed communities in fear and marginalization.

As a unified bar, we are mindful of the breadth of perspectives encompassed in our membership.   As such, our work will continue to focus specifically on those issues

that are directly within our mission, including the promotion of access to justice, the rule of law, and a healthy and functional judicial system that equitably serves everyone. The current climate of violence, extremism and exclusion gravely threatens all of the above. As lawyers, we administer the keys to the courtroom, and assist our clients in opening doors to justice. As stewards of the justice system, it is up to us to safeguard the rule of law and to ensure its fair and equitable administration. We simply cannot lay claim to a healthy justice system if whole segments of our society are fearful of the very laws and institutions that exist to protect them.

In today's troubling climate, the Oregon State Bar remains committed to equity and justice for all, and to vigorously promoting the law as the foundation of a just democracy. The courageous work done by specialty bars throughout the state is vital to our efforts and we continue to be both inspired and strengthened by those partnerships. We not only refuse to become accustomed to this climate, we are intent on standing in support and solidarity with those historically marginalized, underrepresented and vulnerable communities who feel voiceless within the Oregon legal system.

The second statement was signed by the Presidents of seven Oregon Specialty Bar Associations, which are voluntary organizations separate from OSB. It said:

### Joint Statement of the Oregon Specialty Bar Associations Supporting the Oregon State Bar's Statement on White Nationalism and Normalization of Violence

The Oregon Asian Pacific American Bar Association, the Oregon Women Lawyers, the Oregon Filipino American Lawyers Association, OGALLA-The LGBT Bar Association of Oregon, the Oregon Chapter of the National Bar Association, the Oregon Minority Lawyers Association, and the Oregon Hispanic Bar Association support the Oregon State Bar's Statement on White Nationalism and Normalization of Violence and its commitment to the vision of a justice system that operates without discrimination and is fully accessible to all Oregonians.

Through the recent events from the Portland MAX train attacks to Charlottesville, we have seen an emboldened white nationalist movement gain momentum in the United States and violence based on racism has become normalized. President Donald Trump, as the leader of our nation, has himself catered to this white nationalist movement, allowing it to make up the base of his support and providing it a false sense of legitimacy. He has allowed this dangerous

movement of racism to gain momentum, and
we believe this is allowing these extremist
ideas to be held up as part of the mainstream,
when they are not.  For example, President
Trump has espoused racist comments,
referring to Haiti and African countries as
"shithole countries" and claiming that the
United States should have more immigrants
from countries like Norway.  He signed an
executive order that halted all refugee
admissions and barred people from seven
Muslim-majority countries, called Puerto
Ricans who criticized his administration's
response to Hurricane Maria "politically
motivated ingrates," said that the white
supremacists marching in Charlottesville,
[Virginia] in August of 2017 were "very fine
people," and called into question a federal
judge, referring to the Indiana-born judge as
"Mexican," when the race of his parents had
nothing to do with the judge's decision.  We
are now seeing the white nationalist
movement grow in our state and our country
under this form of leadership.

    As attorneys who lead diverse bar
associations throughout Oregon, we
condemn the violence that has occurred as a
result of white nationalism and white
supremacy.  Although we recognize the
importance of the First Amendment of the
United States Constitution and the
protections it provides, we condemn speech
that incites violence, such as the violence that

occurred in Charlottesville.  President Trump
needs to unequivocally condemn racist and
white nationalist groups.  With his continued
failure to do so, we must step in and speak up.

As attorneys licensed to practice law in
Oregon, we took an oath to "support the
Constitution and the laws of the United States
and of the State of Oregon."  To that end, we
have a duty as attorneys to speak up against
injustice, violence, and when state and
federal laws are violated in the name of white
supremacy or white nationalism.  We must
use all our resources, including legal
resources, to protect the rights and safety of
everyone.  We applaud the Oregon State
Bar's commitment to equity and justice by
taking a strong stand against white
nationalism.  Our bar associations pledge to
work with the Oregon State Bar and to speak
out against white nationalism and the
normalization of racism and violence.

Daniel Crowe, an attorney and member of OSB, objected
to the statements.  OSB's bylaws provide a dispute
resolution procedure by which a member of the Bar can
request a refund for "any portion of the member's bar dues
[used] for activities he or she considers promotes or opposes
political or ideological causes."  OSB Bylaws § 11.3.
Invoking that policy, Crowe demanded a refund of his dues.
OSB gave Crowe and other objecting members refunds for
their shares of the cost of publishing the April 2018 issue of
the *Bulletin*, plus interest.

## B.

### 1.

Still unsatisfied, Crowe filed a lawsuit against OSB and some of its officers (collectively, "Defendants") alleging violations of his First Amendment rights.[1]

The Complaint alleged, among other things, that OSB used its compulsory dues for activities that were not "germane" to OSB's purpose and that doing so violated Crowe's right to freedom of speech; that OSB's refund process for objecting members was insufficient; and that compulsory membership in OSB violated his right to freedom of association. Crowe sought declaratory and injunctive relief, as well as damages in the amount of all the dues he previously paid to OSB.

Defendants moved to dismiss, and the district court granted the motion. Crowe appealed.

On appeal, our court affirmed in part and reversed in part. *Crowe v. Or. State Bar*, 989 F.3d 714, 720 (9th Cir. 2021) ("*Crowe I*"). Applying the then-controlling test, we held that OSB was not an arm of the state entitled to sovereign immunity. *Id.* at 730-33 (applying test from

---

[1] Crowe also formed the Oregon Civil Liberties Attorneys ("ORCLA"), and ORCLA joined him as a co-plaintiff in this suit. ORCLA has asserted that it has organizational standing under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), based on Crowe's injuries and Crowe's membership in ORCLA. We remand to the district court to consider in the first instance whether ORCLA has standing to pursue a freedom of association claim. *See id.* (explaining that, for an organization to have standing, "the claim asserted . . . [must not] require[] the participation of individual members in the lawsuit"). Because we focus in this opinion only on Crowe, we refer to him as the only relevant plaintiff.

*Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988)).

We also held that Crowe had not stated a freedom of speech claim. *Id.* at 727. We explained that in *Keller v. State Bar of California*, 496 U.S. 1 (1990), the Supreme Court held that "a state bar may use mandatory dues to subsidize activities 'germane to th[e] goals' of 'regulating the legal profession and improving the quality of legal services' without running afoul of its members' First Amendment rights of free speech." *Crowe I*, 989 F.3d. at 724 (quoting *Keller*, 496 U.S. at 13-14). If a state bar engages in nongermane activities, that does not violate the members' freedom of speech so long as the bar has adequate safeguards to protect the rights of any objecting member, including a process for refunding the portion of the member's dues used for any nongermane activities. *See id.* at 725-26. Applying *Keller*, we held that OSB's refund process was adequate and that Crowe's freedom of speech claim failed because any injury had been remedied by the refund he had received. *Id.* at 726-27. For purposes of the freedom of speech claim, we did not decide whether the two *Bulletin* statements were germane under *Keller* or whether the Specialty Bars' statement was attributable to OSB.[2] *Id.* at 724.

In contrast to the freedom of speech claim, we held that Crowe's freedom of association claim could be "viable" because it was not foreclosed by prior precedent. *Id.* at 729. We explained that *Keller* did not foreclose Crowe's claim

---

[2] We also rejected Crowe's argument that, because of intervening changes in the Supreme Court's precedent on mandatory union dues, *Keller* was no longer good law. *Crowe I*, 989 F.3d. at 724-25. We explained that the Supreme Court has not expressly overruled *Keller*, so, as a lower court, we are still bound by it. *Id.* at 725.

because *Keller* evaluated only a freedom of speech claim and
"expressly declined to address" the plaintiffs' freedom of
association claim. *Id.* at 727.

We then addressed *Lathrop v. Donohue*, 367 U.S. 820
(1961), another Supreme Court case addressing mandatory
state bar associations. In *Lathrop*, an attorney had argued
that the requirement that he join a state bar infringed his right
to freedom of association in part because the bar engaged in
legislative activities like lobbying.        367 U.S. at 822.
Although no opinion was joined by a majority, seven
Justices ruled against the attorney. *See id.* at 848 (plurality
opinion). A plurality of the Supreme Court explained:

> [I]n order to further the State's legitimate
> interests in raising the quality of professional
> services, [the State] may constitutionally
> require that the costs of improving the
> profession . . . be shared by the subjects and
> beneficiaries of the regulatory program, the
> lawyers, even though the organization
> created to attain the objective also engages in
> some legislative activity.

*Id.* at 843.

We held that *Lathrop* did not preclude Crowe's freedom
of association claim for two reasons. First, "*Lathrop*'s 'free
association' decision was limited to 'compelled financial
support of group activities'"; it did not address "'involuntary
membership in any other aspect.'" *Crowe I*, 989 F.3d. at 727
(emphasis omitted) (quoting *Lathrop*, 367 U.S. at 828).
Second, although the attorney in *Lathrop* complained that
the bar was engaging in legislative activities, "the *Lathrop*
plurality presumed, on the bare record before it, that all the

bar's activities, including lobbying, related to 'the regulatory program' of 'improving the profession.'" *Id.* at 727-28 (quoting *Lathrop*, 367 U.S. at 843). Thus, "[a]t bottom, *Lathrop* merely permitted states to compel practicing lawyers to pay toward the costs of regulating their profession," whereas Crowe took issue with more than just the payment of dues, and he asserted that OSB engaged in nongermane activities. *Id.* at 728.

We also held that there was no controlling Ninth Circuit authority and that it was therefore an open question "whether the First Amendment tolerates mandatory membership itself—independent of compelled financial support—in [a state bar] that engages in nongermane political activities." *Id.* at 729. We remanded to the district court to determine the proper test for analyzing such a freedom of association claim and to apply it. *Id.*

**2.**

On remand, the parties conducted discovery and then filed cross-motions for summary judgment. Crowe argued that OSB's nongermane conduct included both the 2018 *Bulletin* statements and some of OSB's lobbying in front of the state legislature that had pushed for changes to the state's substantive laws.

The district court held that compelled state bar membership did not violate the freedom of association so long as the bar engaged in predominantly germane activities. It further held that all of the challenged lobbying and OSB's own statement in the *Bulletin* were germane and that, even if the Specialty Bars' statement was not germane, it would not establish a violation given OSB's predominantly germane activities. The court accordingly denied Crowe's motion for

summary judgment and granted summary judgment in favor
of Defendants.  Crowe timely appealed.

**3.**

After this appeal was filed, we held in *Kohn v. State Bar
of California*, 87 F.4th 1021 (9th Cir. 2023) (en banc), that
our prior test for determining whether an entity is an arm of
the state for purposes of sovereign immunity was no longer
consistent with Supreme Court authority, and we adopted a
new test.  *Id.* at 1027-1030.  The parties in this case then
submitted supplemental briefing on whether OSB is entitled
to sovereign immunity under *Kohn*.

**II.**

"We review de novo the district court's decision on cross
motions for summary judgment.  We consider, viewing the
evidence in the light most favorable to the nonmoving party,
whether there are genuine issues of material fact and whether
the district court correctly applied the relevant substantive
law." *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir.
2007) (citation omitted).

**III.**

We turn first to the question whether OSB is entitled to
immunity from suit under the Eleventh Amendment.  The
Eleventh Amendment provides: "The Judicial power of the
United States shall not be construed to extend to any suit in
law or equity, commenced or prosecuted against one of the
United States by Citizens of another State, or by Citizens or
Subjects of any Foreign State."**[3]**  U.S. Const. amend. XI.

---

[3] "Longstanding Supreme Court precedent has interpreted this
Amendment to immunize states from suit in federal court by citizens and
noncitizens alike." *Kohn*, 87 F.4th at 1025.

"The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994). "This immunity extends not just to suits in which the state itself is a named party but also to those against an 'arm of the [s]tate.'" *Kohn*, 87 F.4th at 1026 (alteration in original) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).

In *Kohn*, we adopted a new, three-factor test for determining whether an entity is an arm of the state. *Id.* at 1030. The test looks to "(1) the [s]tate's intent as to the status of the entity, including the functions performed by the entity; (2) the [s]tate's control over the entity; and (3) the entity's overall effects on the state treasury." *Id.* (alterations in original) (quoting *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873 (D.C. Cir. 2008) ("*PRPA*")). Under the test, "an entity either is or is not an arm of the [s]tate: The status of an entity does not change from one case to the next based on the nature of the suit, the [s]tate's financial responsibility in one case as compared to another, or other variable factors." *Id.* at 1031 (alterations in original) (quoting *PRPA*, 531 F.3d at 873).

Applying that test in *Kohn*, we held that the California State Bar is an arm of the state. *Id.* at 1037. We noted that we were in "good company" because "all the other federal circuits to have considered the question [in recent decades] have agreed: State bars are arms of the state and enjoy sovereign immunity under the Eleventh Amendment." *Id.* We then identified *Crowe I*'s holding that OSB was not an arm of the state as the one exception to that otherwise solid consensus. *Id.* We explained that "[a]ny future case brought

against the Oregon State Bar [would] need to be analyzed under the new test." *Id.* We conduct that analysis now.

## A.

### 1.

The first factor of the *Kohn* test assesses the "[s]tate's intent as to the status of the entity." 87 F.4th at 1030 (alteration in original) (quoting *PRPA*, 531 F.3d at 873). This factor turns on "[1] whether state law expressly characterizes the entity as a governmental instrumentality rather than as a local governmental or non-governmental entity; [2] whether the entity performs state governmental functions; [3] whether the entity is treated as a governmental instrumentality for purposes of other state law; and [4] state representations about the entity's status." *Id.* Oregon's intent here supports concluding that OSB is an arm of the state.

First, Oregon state law characterizes OSB as a state governmental instrumentality, not a local or non-governmental entity. By statute, OSB is "an instrumentality of the Judicial Department of the government of the State of Oregon." Or. Rev. Stat. § 9.010(2). Oregon state courts have also characterized OSB as an instrumentality of the state operating on behalf of the judicial department. *See State ex rel. Frohnmayer v. Or. State Bar*, 767 P.2d 893, 895 (Or. 1989). In *Kohn*, we held that the California Supreme Court's similar descriptions of the California State Bar "as its 'administrative arm' for attorney discipline and admission purposes cut[] decisively in favor of" immunity. 87 F.4th at 1032 (citations omitted).

Second, OSB "performs functions typically performed by state governments." *Id.* at 1033 (quoting *PRPA*, 531 F.3d

at 875).  In *Kohn*, we held that the California State Bar did
so because the licensing, regulation, and discipline of
lawyers are state functions.  *Id*. at 1033-34.  OSB performs
those same functions.    Or. Rev. Stat. §§ 9.080(1)(a)
(providing that OSB's Board of Governors is tasked with
"[r]egulating the legal profession"), 9.112 (providing that
the Board of Governors may set requirements for continuing
legal education, subject to approval by the Oregon Supreme
Court), 9.210(1) (providing that the Board of Bar Examiners
shall "carry out the admissions functions of the Oregon State
Bar"), 9.490(1) (providing that the Board of Governors
"shall formulate rules of professional conduct for attorneys,"
subject to approval by the Oregon Supreme Court).

Third, OSB "is treated as a governmental instrumentality
for purposes of other state law." *Kohn*, 87 F.4th at 1030.  In
*Kohn*, we relied on the fact that the California State Bar is
"subject to California public-records and open-meeting
laws" and that its "property is tax-exempt."  *Id.* at 1034.
OSB is similarly subject to other state laws that apply to
public entities, including the Oregon Tort Claims Act, the
Oregon Public Records Law, and the Oregon Public
Meetings Law. Or. Rev. Stat. § 9.010(3) (providing that "the
[B]ar is subject to [certain] statutes applicable to public
bodies" and listing those statutes).

Fourth, Oregon asserted in an amicus brief in this case
that OSB is an arm of the state. *See Kohn*, 87 F.4th at 1030
(explaining       that     a     court     should     consider     "state
representations about the entity's status" under this factor).
Such a representation weighs in favor of sovereign
immunity. *See PRPA*, 531 F.3d at 876 (relying on a similar
amicus brief in analyzing this factor).

In sum, all four considerations demonstrate that Oregon intended OSB to be an arm of the state.

**2.**

The second *Kohn* factor assesses the state's control over the entity. 87 F.4th at 1030. This factor "depends on how members of the governing body of the entity are appointed and removed, as well as whether the state can 'directly supervise and control [the entity's] ongoing operations.'" *Id.* (alteration in original) (quoting *PRPA*, 531 F.3d at 877). Although Oregon has somewhat less control over OSB than California did over the California State Bar in *Kohn*, this factor still weighs in favor of concluding that OSB is an arm of the state.

In *Kohn*, we relied on the fact that the state government had "the power to appoint the [California] State Bar's governing structure"—the Board of Trustees and the Committee of Bar Examiners. *Id.* at 1035. Here, the Oregon Supreme Court appoints one of OSB's equivalent bodies but not the other. As in *Kohn*, the state supreme court appoints the officers who oversee attorney admissions (OSB's Board of Bar Examiners). Or. Rev. Stat. § 9.210(1). But unlike in *Kohn*, the state has no role in appointing members of the Bar's board (OSB's Board of Governors), most of whom are elected by OSB's members. Or. Rev. Stat. §§ 9.080, 9.025(1)(a). The state also has no role in the removal of members of the Board of Governors. *See* Or. Rev. Stat. § 9.050; OSB Bylaws § 2.9.

Still, we must consider whether Oregon exercises other forms of control over OSB. Here, as in *Kohn*, the Bar is controlled by the state supreme court, and that control weighs in favor of concluding that the Bar is an arm of the state.

In *Kohn*, we observed that the California State Bar's admission rules, admission decisions, and disciplinary decisions were subject to the California Supreme Court's review. *Kohn*, 87 F.4th at 1035. We described that oversight as an exercise of "significant control over the State Bar's functioning." *Id.* Similarly, the Oregon Supreme Court "makes final decisions on admitting attorneys, disciplining attorneys, and adopting rules of professional conduct." *Crowe I*, 989 F.3d at 732; *see also* Or. Rev. Stat. §§ 9.490(1), 9.527, 9.529, 9.536, 9.542.

Oregon also exercises some control over OSB's budget. OSB submits an annual budget for its admissions, discipline, and continuing legal education programs to the Oregon Supreme Court for review and approval. OSB Bylaws § 2.1(d). And the Oregon Supreme Court approves the fees that OSB sets for admission. *Id.* § 22.5.

On balance, the extent of Oregon's control over OSB weighs in favor of concluding that OSB is an arm of the state.

**3.**

The final *Kohn* factor looks to the entity's "financial relationship" with the state and the entity's "overall effects" on the state's treasury. 87 F.4th at 1036. "In analyzing this third factor . . . the relevant issue is a [s]tate's overall responsibility for funding the entity or paying the entity's debts or judgments." *Id.* (alterations in original) (quoting *PRPA*, 531 F.3d at 878).

In *Kohn*, we said that this factor was a "closer call" than the other two. *Id.* at 1037. We recognized that the California State Bar is "responsible for its own debts and liabilities, so California would not be liable for a judgment against the State Bar." *Id.* at 1036. But we acknowledged the California

State Bar's argument that "if the State Bar were unable to satisfy a money judgment against it," California would likely step in to ensure that the Bar could continue to perform its "'vital governmental function.'" *Id.* at 1036-37 (quoting *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 381 (9th Cir. 1993)). We did not fully resolve the extent to which the California State Bar affects or could affect the California treasury, explaining that this factor was not dispositive because "the intent and control factors strongly favor[ed]" concluding that the California State Bar was an arm of the state. *Id.* at 1037.

Here, OSB is also responsible for its own debts and liabilities, so Oregon would not be liable for a judgment against OSB. Or. Rev. Stat. § 9.010(6). But, as in *Kohn*, if the Bar were to become insolvent, the state would likely step in with financial support so that the Bar could continue to perform its critical state functions. Given that the intent and control factors strongly weigh in favor of concluding that OSB is an arm of the state, we need not fully resolve the third factor. *See Kohn*, 87 F.4th at 1037.

Having evaluated the three *Kohn* factors, we hold that OSB is an arm of the state. The claims against OSB must therefore be dismissed on sovereign immunity grounds. *See id.* at 1025-26.

**B.**

OSB's immunity does not end this case. Sovereign immunity shields the state (and arms of the state) from suit. *Kohn*, 87 F.4th at 1025-26. But "[u]nder *Ex Parte Young* and its progeny, a suit seeking prospective equitable relief against a state official [sued in her official capacity] who has engaged in a continuing violation of federal law is not deemed to be a suit against the [s]tate for purposes of state

sovereign immunity." *In re Ellett*, 254 F.3d 1135, 1138 (9th Cir. 2001) (citing *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)).  Here, in addition to suing OSB, Crowe has sued OSB's officers in their official capacities seeking prospective declaratory and injunctive relief for violating his freedom of association right.  Sovereign immunity does not prevent that part of his case from proceeding.[4]

## IV.

We now turn to the merits of Crowe's freedom of association claim.  The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[5]  U.S. Const. amend. I.  The Supreme Court has held that the First Amendment implicitly recognizes "a right to associate for the purpose of engaging in those activities" that it explicitly protects.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  The freedom of association "plainly presupposes a freedom not to associate."  *Id.* at 623.  But the freedom of association (including the freedom not to associate) does not protect all "associations."  Because the freedom of association is a corollary to other First Amendment rights, it only protects

---

[4] Crowe also seeks to recover the dues he paid to OSB, but sovereign immunity precludes claims for retrospective relief against officer defendants sued in their official capacities.  *Koala v. Khosla*, 931 F.3d 887, 894-95 (9th Cir. 2019).  We therefore dismiss those claims.

[5] The Fourteenth Amendment incorporates the First Amendment against the states.  *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 755 n.1 (9th Cir. 2019) (en banc).

"associations to the extent that they are expressive." *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1194 (9th Cir. 1988).

When a mandatory association infringes freedom of association, that infringement is permissible if it "serve[s] a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 310 (2012) (second and third alterations in original) (quoting *Jaycees*, 468 U.S. at 623). We have referred to that test as "exacting scrutiny." *Mentele v. Inslee*, 916 F.3d 783, 790 & n.3 (9th Cir. 2019).

In analyzing Crowe's freedom of association claim, we accordingly must ask whether the challenged governmental conduct infringes the right to freedom of association at all, and if it does, whether that infringement can survive exacting scrutiny.

**A.**

When a plaintiff challenges a requirement that he join an organization, the plaintiff can establish an infringement on his freedom of association by showing that his membership in the organization impairs his own expression. The plaintiff can make that showing if a reasonable observer would attribute some meaning to his membership—because, for instance, a reasonable observer would assume that the plaintiff agrees with the organization's articulated positions—and he objects to that meaning. We first explain how that test flows from existing freedom of association caselaw. We then explain why Crowe has satisfied that test.

**1.**

Not all interactions with other people that "might be described as 'associational' in common parlance . . . involve

the sort of expressive association that the First Amendment
has been held to protect." *City of Dallas v. Stanglin*, 490
U.S. 19, 24 (1989). For example, in *IDK, Inc. v. Clark
County*, 836 F.2d 1185 (9th Cir. 1988), we held that the
relationships between escort services and their clients were
not protected by the freedom of association because the
relationships were part of a "primarily commercial
enterprise[]" and expression was not a "significant or
necessary component of their activities." *Id.* at 1195.

In the same vein, the "freedom not to associate"—which
Crowe invokes here—is not implicated every time a person
would prefer to avoid some interaction. For instance, in
*Rumsfeld v. Forum for Academic and Institutional Rights,
Inc.*, 547 U.S. 47 (2006), law schools challenged a
requirement that, to receive federal funding, they allow
military recruiters onto their campuses and assist those
recruiters as they would any others. *Id.* at 52-53. The law
schools argued, among other things, that the requirement
infringed their freedom of association because the law
schools objected to the military's "Don't Ask, Don't Tell"
policy. *Id.* Although the law schools argued that requiring
them to interact with military recruiters "impair[ed] their
own expression," the Court held that a plaintiff could not
establish an infringement on the freedom of association
"'simply by asserting' that mere association 'would impair
its message.'" *Id.* at 69 (quoting *Boy Scouts of Am. v. Dale*,
530 U.S. 640, 653 (2000)). The Supreme Court
acknowledged that the law schools were required to
"'associate' with military recruiters in the sense that they
interact[ed] with them." *Id.* But the Court held that the
requirement did not infringe the schools' freedom of
association because the recruiters had only a passing
presence on campus and because students and faculty were

"free to associate to voice their disapproval of the military's message"—in other words, the schools were not required to accept the recruiters into the campus community in any meaningful sense. *Id.* at 69-70.

Taken together, those cases establish that a plaintiff cannot demonstrate that his freedom of association is infringed merely by pointing to the fact that he is required to interact with an organization in some sense. Instead, he must show that the required association impairs his expression. Other cases make clear that a plaintiff can make that showing if a reasonable observer would impute some meaning to membership in the organization and the plaintiff objects to that meaning.[6]

In *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Supreme Court held that a state antidiscrimination law that required the Boy Scouts to admit a gay scoutmaster violated the Boy Scouts' freedom of association. *Id.* at 644. The Court explained that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. Under that test, the Court held that the antidiscrimination requirement at issue burdened the Boy Scouts' expression because the Boy Scouts objected to same-sex relationships, and the scoutmaster was a "gay rights activist," so his membership would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.*

---

[6] We do not foreclose the possibility that a plaintiff could establish that a membership requirement burdens his expression in some other way; we conclude only that this is one way to establish an infringement.

at 650, 653.  Significantly, the Court thought that the scoutmaster's membership would send that message even though the Boy Scouts could presumably have made clear that it was not voluntarily choosing to admit the gay scoutmaster.  The Court then held that this burden on the Boy Scouts' associational rights was not justified by the state's interests.  *Id.* at 656-59.  Although in *Dale* an organization challenged a law requiring it to admit a member, it follows from *Dale*'s reasoning that when an individual challenges a law that requires him to become a member, he can show that the requirement infringes his freedom of association if the membership "send[s] a message" to a reasonable observer about his own views and he objects to that message.  *Id.* at 653.

By contrast, in *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court rejected the Jaycees organization's argument that an antidiscrimination law that required it to admit women as full voting members violated its freedom of association.  *Id.* at 612.  The Court "decline[d] to indulge in the sexual stereotyping that underlie[d] [the Jaycees'] contention that, by allowing women to vote, application of the [antidiscrimination law would] change the content or impact of the organization's speech."  *Id.* at 628. Moreover, the Jaycees already invited women to participate in the group as nonvoting members, so "any claim that admission of women as full voting members [would] impair a symbolic message conveyed by the very fact that women [were] not permitted to vote [was] attenuated at best."  *Id.* at 627.  Thus, the requirement did not impose "any serious burdens on the male members' freedom of expressive association."  *Id.* at 626.  In other words, because neither the Jaycees' actual speech nor any symbolic message sent by its membership choices would be meaningfully changed by

complying with the antidiscrimination law, the Court concluded that the Jaycees' freedom of association claim failed.  As relevant here, *Jaycees* further supports that an individual person can challenge a requirement that he become a member by showing that a reasonable observer would impute to him a message to which he objects.[7]

**2.**

We now turn to the application of that test to claims of compelled membership and then to Crowe's claim specifically.[8]

Whether a reasonable observer will attribute any meaning to "membership" alone depends on the nature of a group.  Obviously, membership in a political party sends an expressive message.  Even if a person takes no other action to support a political party, a reasonable observer understands that membership in the political party, standing alone, says something about the person's views.  *Cf. Elrod v. Burns*, 427 U.S. 347, 355-56 (1976) (plurality opinion) (holding that a requirement that public employees join the Democratic Party infringed their freedom of association).  But the word "membership" is used to refer to all sorts of

---

[7] It is not entirely clear whether the Court in *Jaycees* rejected the freedom of association claim because it determined that there was no infringement or because it determined that the infringement was constitutionally permissible.  *See* Seana Valentine Shiffrin, *What Is Really Wrong with Compelled Association*?, 99 Nw. U. L. Rev. 839, 843-44 (2005) (discussing this ambiguity).  Either way, *Jaycees* supports the principle we rely on here.

[8] Crowe has not argued that he is required to personally voice OSB's own views, attend OSB's meetings, or to refrain from joining other organizations or voicing his own opinions.  We need not and do not address how such other types of requirements would be analyzed.

relationships: A person might be a member of a public library, Costco, AMC, or, back in the day, Blockbuster. Those memberships may not send any message at all.

Whether a reasonable observer will attribute any meaning to such memberships will depend on context, and there may plausibly be circumstances where membership in a group becomes expressive. But as relevant here, the bare fact that an attorney is a member of a state bar does not send any expressive message. A state bar's primary function is to license, regulate, and discipline attorneys—activities that are essentially commercial in nature. *Cf. Rumsfeld*, 547 U.S. at 64 ("[A] law school's decision to allow recruiters on campus is not inherently expressive. Law schools facilitate recruiting to assist their students in obtaining jobs."). And a reasonable observer understands state bar membership to mean only that the attorney is licensed by the bar. Thus, even when the bar engages in expression, a reasonable observer ordinarily would not interpret the fact that the attorney is a member of the bar to mean that the bar's activities reflect the attorney's personal views.

That can be true even if some of the state bar's expression is not germane to the bar's regulatory purposes. In *Morrow v. State Bar of California*, 188 F.3d 1174 (9th Cir. 1999), the plaintiffs argued that the requirement that they join the California State Bar infringed their freedom of association because that Bar engaged in nongermane political activities—specifically, supporting four bills before the California legislature. *Id.* at 1175. We rejected the plaintiffs' argument that "membership alone may cause the public to identify plaintiffs with State Bar positions in violation of plaintiffs' First Amendment [freedom of association] rights." *Id.* at 1177. That holding rested on the notion that the public would not associate a state bar's

occasional nongermane activities with its members merely by virtue of their membership.

But, in the particular circumstances of this case, Crowe has shown that a reasonable observer would attribute meaning to his membership in OSB because of the *Bulletin* statements.  OSB endorsed the Specialty Bars' statement criticizing then-President Trump and suggested that all members agreed with it.

Specifically, the formatting and content of the two statements made it appear as though OSB essentially adopted the Specialty Bars' statement.  OSB made the editorial decision to publish the two statements side-by-side, surrounded by a single dark green border that was the same color as OSB's logo.  And OSB's statement echoed the themes in the Specialty Bars' statement, using strikingly similar language.  For example, the Specialty Bars' statement "condemn[ed] speech that incites violence" and made clear that it was referring to then-President Donald Trump's speech specifically, offering several examples. OSB's statement likewise criticized the "systemic failure to address speech that incites violence."  In context, one would assume that OSB's reference to "speech that incites violence" was also referencing then-President Trump.

OSB's statement also praised the Specialty Bars specifically.  OSB said, "The courageous work done by specialty bars throughout the state is vital to our efforts and we continue to be both inspired and strengthened by those partnerships."  By praising the "work" of the Specialty Bars, which would presumably include the immediately adjacent statement, and describing the relationships between OSB and the Specialty Bars as "partnerships," OSB again appeared to implicitly endorse the Specialty Bars' statement.

The Specialty Bars, in turn, "applaud[ed] the Oregon State Bar's commitment to equity and justice by taking a strong stand against white nationalism," and "pledge[d] to work with the Oregon State Bar." Reading those expressions of mutual praise, one would interpret the two statements to be a reflection of OSB's and the Specialty Bars' shared views.

If OSB had made clear that its own statement reflected the views of OSB's leadership—and not its members—then there would be no infringement. But OSB suggested the opposite. Although the statement said "[a]s a unified bar, we are mindful of the breadth of perspectives encompassed in our membership," it immediately implied that the contents of its statement were one thing on which all members agreed. It did so by saying that, given that breadth of perspectives, "we" would focus on "those issues that [were] directly within our mission," which was "gravely" threatened by the "current climate of violence, extremism and exclusion." That would seem to suggest that all members agreed with what was in the statement because it dealt with topics on which there was no "breadth of perspectives." The statement reinforced that idea by using "we" and "our" throughout in a way that purported to speak for all members of OSB. For instance, it said, "As lawyers, we administer the keys to the courtroom." That could only mean all OSB members, not the six OSB officers who signed the statement.

The implication that OSB was speaking on behalf of all the attorneys it regulates was accentuated by the fact that those attorneys are called "members," *see* Or. Rev. Stat. § 9.160(1), as opposed to something more neutral, such as "licensees." As we have explained, the fact that a state bar refers to attorneys as "members," standing alone, does not mean that a reasonable observer would think that an attorney shares the views of the bar. But the word "member" does

connote a stronger relationship than just a regulatory one, which makes it more likely that a reasonable observer would read a statement like OSB's to actually speak on behalf of the attorneys it regulates.

The *Bulletin* statements make this case analogous to *Carroll v. Blinken*, 957 F.2d 991 (2d Cir. 1992). There, students were required to pay an annual "activity fee" to their university, part of which was used to fund a policy advocacy organization called the New York Public Interest Research Group, Inc. ("NYPIRG"). *Id.* at 993-94. NYPIRG sought to advance "certain positions on issues of public policy," such as arms control and environmental protection, "through research, campus speakers, lobbying the legislature, intervening in lawsuits, community organizing, brochures, and other methods." *Id.* at 994, 997. According to NYPIRG's bylaws, any student who paid the activity fee was automatically a "member" of NYPIRG, and "on the strength of this by-law, NYPIRG claim[ed]" in its advocacy "to represent all students at the nineteen participating campuses." *Id.* at 995.

The Second Circuit held that the automatic membership policy infringed the students' freedom of association. *Id.* at 1003. The court explained that "NYPIRG expressly forge[d] . . . a link" "in the popular mind" between its views and the students' views "when it proclaim[ed] that its 'membership' include[d] all fee paying [university] students" and when it "overtly and inaccurately claim[ed] to represent the interests of the [university] student body." *Id.* NYPIRG thus "irredeemably transgressed the proscription against forced association." *Id.*

*Carroll* counsels that if an organization trades on its membership in advancing its own views, a reasonable

observer may come to (incorrectly) believe that the organization speaks for its members even though membership is mandatory, and in that circumstance, a membership requirement can infringe the freedom of association. Considering the totality of the circumstances here, OSB traded on its supposedly unified membership to bolster its own expression, fostering a misperception about the unanimity of its members' views.

Crowe has also established that the association impaired his own expression because he objects to the message sent by his membership. He testified at his deposition that he disagreed with the *Bulletin* statements and that he did not want to be associated with them. Crowe has thus established an infringement on his freedom of association.

**B.**

Such an infringement on the freedom of association is nonetheless permissible if it survives exacting scrutiny. *Mentele*, 916 F.3d at 790 & n.3. Under exacting scrutiny, the infringement must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms."[9]  *Id.* at 790 (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894 (2018)). The Supreme Court has observed that *Keller*'s germaneness requirement "fits comfortably" within the exacting scrutiny framework in the

---

[9] The Supreme Court has mused about whether strict scrutiny should replace exacting scrutiny in certain First Amendment contexts. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894-95 (2018). But we have already held that we are "obliged to apply 'exacting scrutiny' to decide whether [a compelled association] is constitutionally permissible" because the Court has not overruled its precedents applying that test. *Mentele*, 916 F.3d at 790 n.3.

state bar association context because states have a strong
interest in "'regulating the legal profession and improving
the quality of legal services,'" as well as in "allocating to the
members of the bar, rather than the general public, the
expense of ensuring that attorneys adhere to ethical
practices." *Harris v. Quinn*, 573 U.S. 616, 655-56 (2014)
(quoting *Keller*, 496 U.S. at 13). That statement indicates
that when a state bar requires attorneys to associate with
germane activities, that requirement survives exacting
scrutiny.[10]

Consistent with that principle, we held in *Gardner v.
State Bar of Nevada*, 284 F.3d 1040 (9th Cir. 2002), that
even if the public might associate attorneys with a state bar's
expressive activities, that association is permissible if the
activities are germane. There, the State Bar of Nevada
engaged in a public relations campaign that sought to "dispel
any notion that lawyers are cheats or are merely dedicated to
their own self-advancement or profit." *Id.* at 1043. The

---

[10] On this point, we agree with the Fifth Circuit, which has held that
"[c]ompelled membership in a bar association that is engaged in only
germane activities survives [exacting] scrutiny." *McDonald v. Longley*,
4 F.4th 229, 246 (5th Cir. 2021). But we disagree with the Fifth Circuit's
holding that if a state bar engages in nongermane activities, compelled
membership is necessarily unconstitutional. *See id.*; *see also
Boudreaux v. La. State Bar Ass'n*, 86 F.4th 620, 632-34 (5th Cir. 2023)
(holding that a state bar violated its attorneys' right to freedom of
association by, among other things, tweeting about the health benefits of
eating walnuts and promoting a holiday charity drive). As we have
explained, in many circumstances, membership in a state bar, standing
alone, has no expressive meaning, and the public will not associate the
bar's members with the bar's activities. In those circumstances, the
membership requirement does not infringe the freedom of association—
even if the bar engages in nongermane activities such as offering dietary
advice or promoting a charity drive.

campaign instead promoted the notion that lawyers "strive to make the law work for everyone." *Id*. An attorney objected to the campaign in part because he believed lawyers "are supposed to serve their clients, not 'everyone.'" *Id.*

We acknowledged that the attorney was forced to associate with the campaign in two ways. First, his dues were used to fund the campaign. *Id.* at 1042. Second, he was associated with the State Bar of Nevada's activities in the public eye: The public relations campaign spoke about the ethics and activities of all of that Bar's members, so it was likely to be attributed to those members. *See id.* We recognized that such "[c]ompulsion to be associated with an organization whose very public campaign proclaims a message one does not agree with is a burden." *Id.* But we concluded that the campaign was germane to the Bar's purposes, so the burden did not violate the attorney's freedom of association. *Id.* at 1042-43. The Bar had a compelling interest in advancing public understanding of the role of attorneys, and in doing so, it could purport to represent the state's attorneys without violating their freedom of association rights. *See id.* at 1043.

In this case, by contrast, OSB engaged in nongermane conduct by adopting the Specialty Bars' statement. The "guiding standard" in determining whether an activity is germane is whether it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843). At least some of the Specialty Bars' statement was not germane. The statement opened by describing the Specialty Bars' "commitment to the vision of a justice system that operates without discrimination," but much of its criticism of then-President Trump did not relate

CROWE V. OREGON STATE BAR

to the justice system at all—for instance, it criticized Trump for describing Haiti and African countries as "shithole countries." Although preventing violence and racism can relate to improving the legal system, the connection here was too tenuous. *See Schneider v. Colegio de Abogados de P.R.*, 917 F.2d 620, 632 (1st Cir. 1990) (holding that a bar's activities that "rest[] upon partisan political views rather than on lawyerly concerns" are not germane). Because the Specialty Bars' statement was not germane, OSB's adoption of the Specialty Bars' statement was not germane either. OSB has not offered any other justification for associating its members with the *Bulletin* statements. Thus, the infringement does not survive exacting scrutiny.[11]

**C.**

The remedy for this violation need not be drastic. Of course, if OSB engaged only in germane activities, it would not infringe the freedom of association. But even if OSB does engage in nongermane activities, in situations in which those activities might be attributed to its members it could include a disclaimer that makes clear that it does not speak on behalf of all those members.[12] *Cf. PruneYard Shopping*

---

[11] Because we conclude that OSB's adoption of the Specialty Bars' statement was not germane, we do not address any of the lobbying challenged in this case. The district court may consider the lobbying on remand.

[12] We recognize that First Amendment violations are not always cured by a disclaimer. If the state compels a speaker to actually speak (or otherwise disseminate the state's message), the state cannot avoid a First Amendment problem simply by providing a disclaimer that says the speech is compelled. *E.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 12-16 & n.11 (1986) (plurality opinion) (holding that a disclaimer did not avoid a First Amendment violation where the

*Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (holding that a requirement that a public shopping center allow leafleting did not violate the First Amendment in part because "[t]he views expressed by members of the public in passing out pamphlets or seeking signatures for a petition . . . [would] not likely be identified with those of the [shopping center] owner"); *Lindke v. Freed*, 601 U.S. 187, 202 (2024) ("Markers like [disclaimers] give speech the benefit of clear context."). OSB could also lessen the risk of misattribution by following the California State Bar's lead and referring to attorneys as "licensees," rather than "members." *See* Cal. Bus. & Prof. Code § 6002.

We leave it to the district court to determine on remand, with further input from the parties, the appropriate forward-looking relief. We hold only that Crowe has established an infringement on his freedom of association and that the infringement does not survive exacting scrutiny.

**V.**

For the foregoing reasons, we dismiss the claim against OSB and the claim for retrospective relief against the individual officer Defendants. We reverse the judgment of the district court as to the freedom of association claim for prospective equitable relief against the individual officer Defendants and remand for further proceedings.

**DISMISSED in part; REVERSED in part and REMANDED for further proceedings.**

---

government required a company to disseminate the views of a third party). But, here, the only infringement Crowe has shown is that OSB, through its own speech, has suggested that Crowe shares OSB's views. A disclaimer would have prevented that infringement from occurring in the first place.